WALLING, Administrator of Wage and Hour Division, U. S. Dept. of Labor, v. LIPPOLD et al.

Civil Action No. 236—46.

District Court, D. Nebraska, Omaha Division.

July 2, 1947.

William S. Tyson, Sol., of Washington, D. C., Reid Williams, Reg. Atty., Wage and Hour Division, Department of Labor, and John A. Weiss, Atty., Wage and Hour

Division, Department of Labor, both of Kansas City, Mo. (Jeter S. Ray, Associate Sol., and John J. Babe, Asst. Sol., both of Washington, D. C., on the brief), for plaintiff.

Herbert W. Fischer, of Fischer, Fischer & Fischer, of Omaha, Neb. (Ben F. Shrier, of Omaha, Neb., on the brief), for defendants.

DONOHOE, District Judge.

L. Metcalfe Walling, Administrator of the Wage and Hour Division, United States Department of Labor, has brought this action against Fred S. Lippold and Harold J. Lippold, copartners, doing business as Kitty Clover Potato Chip Company, for an injunction permanently enjoining and restraining the defendants from violating provisions of Sections 15 (a)(1), 15(a)(2) and 15(a)(5) of the Fair Labor Standards Act of 1938, Act of June 25, 1938, c. 676, 52 Stat. 1060, U. S.C.A. Title 29, § 201 et seq. Pursuant to stipulations, and by orders of the court, William R. McComb, Administrator of the Wage and Hour Division, United States Department of Labor, has been substituted as plaintiff, and Lou Lippold has been joined as an additional party defendant. In the initial stages of the trial, it was stipulated:

"That the defendants at their plant at 1105 South 24th Street in the city of Omaha (Nebraska) are engaged in the manufacture or production of potato chips, fried popcorn, and in the sale of popcorn for popping in packages; that the company has its main office here in Omaha and has branch offices in Sioux City (Iowa) and Kansas City (Missouri) which are distribution points; that it also has salesmen working in Iowa, out of the Omaha office; that all popcorn and potato chips which are sold in Missouri and Kansas are produced here in Omaha and shipped in large tins for convenient re-packaging in Kansas City or Sioux City and then resold, and that the company ships from between 35% to 40% of the products which it manufactures to the states of Iowa, Missouri and Kansas, and that the employees here involved are engaged in the production of popcorn and potato chips, which are shipped to Kansas, Missouri and Iowa."

The action is founded upon an alleged failure to pay overtime to, and maintain proper records for, eight of the defendants' employees: Peter Ghiringhello, Richard Kisicki, Nicholas R. Lippold, William Ramsey, Helen Ramsey, Marjorie Wyman, Mary Wirzbicki and Jean Heffner, the latter of whom is no longer employed by the defendants and was not produced as a witness.

The court makes the following special Findings of Fact.

1. Peter Ghiringhello is employed by the defendants as a janitor in charge of a night crew of three or four employees who clean the defendants' plant and certain heavy machines used in making potato chips. Except for time spent in carrying oil to cool the machines for cleaning, most of Mr. Ghiringhello's time is spent working with, and performing duties of the same nature as those performed by, other employees on this night crew. There is no evidence as to the amount of time spent by Mr. Ghiringhello in supervising, or as to the regular or customary exercise of discretion by him. The evidence, while showing that Mr. Ghiringhello has occasionally brought in men for hiring by the defendants, does not establish that he has the power to hire and fire employees.

2. On or about June 11, 1942, the defendants, with Mr. Ghiringhello's consent, placed Mr. Ghiringhello on a weekly salary basis of $27.50 per week. Prior to this time, he had been employed by defendants on an hourly basis at the rate of 40¢ per hour for forty hours and 60¢ per hour for time in excess of forty hours per week. During the ten weeks immediately preceding the change from an hourly to a weekly basis, Mr. Ghiringhello's hours of employment by the defendants had ranged from 46 to 58.75 hours per week; the weekly average being 55.25 hours. His weekly earnings had ranged from $19.60 to $27.25; the average being $25.15 per week. In 1943, Mr. Ghiringhello's salary was increased by the defendants to $35.00 per week;

on March 22, 1945, to $38.00 per week; and on April 17, 1947, to $42.00 per week.

3. Richard Kisicki is employed by the defendants as an assistant foreman in charge of employees operating two heavy machines used in making potato chips. In the absence of Mr. Flowers, the plant superintendent, Mr. Kisicki acts as supervisor. About 50% of his time is spent in maintaining the equipment and machines and in plant maintenance. There is no evidence as to the amount of time spent by Mr. Kisicki in performing the duties of Mr. Flowers or as to the exercise of discretionary powers by Mr. Kisicki.

4. On or about January 1, 1942, the defendants, with Mr. Kisicki's consent, placed Mr. Kisicki on a weekly salary basis of $27.50 per week. Prior to this time, he had been employed by the defendants on an hourly basis at the rate of 40¢ per hour for forty hours and 60¢ per hour for time in excess of forty hours per week. During the ten weeks immediately preceding the change from an hourly to a weekly basis, Mr. Kisicki's hours of employment by the defendants had ranged from 42.75 to 53.5 hours per week; the weekly average being 50.25 hours. His weekly earnings had ranged from $18.25 to $42.65 (the latter figure including a Christmas bonus of $27.50); the average being $24.65 per week. In 1943, Mr. Kisicki's salary was increased by the defendants to $35 per week; on February 24, 1944, to $40 per week; on January 4, 1945, to $45 per week; on December 6, 1945, to $55 per week; and on April 10, 1947, to $60 per week.

5. Nicholas R. Lippold is employed in the defendant's office. His duties consist of cleaning the office, carrying mail, making trips to the bank, and running other errands on business connected with the office. He does not sell or deliver the defendants' products.

6. On or about January 1, 1942, the defendants, with the consent of Nicholas R. Lippold, placed Mr. Lippold on a weekly salary basis of $22.50 per week. Prior to this time, he had been employed by the defendants on an hourly basis at the rate of 33¢ per hour for forty hours and 49½¢ per hour for time in excess of forty hours per week. During the eleven weeks immediately preceding the change from an hourly to a weekly basis, Mr. Lippold's hours of employment by the defendants had ranged from 13.25 to 54 hours per week; the weekly average being 47 hours. His weekly earnings had ranged from $4.37 to $20.13; the average being $17.17 per week. In September, 1942, Mr. Lippold's salary was increased by the defendants to $25 per week; on January 3, 1946, to $30 per week; and on April 3, 1946, to $42 per week.

7. William Ramsey and his wife, Helen Ramsey, occupy an apartment in the building where the defendants' plant is located. Mr. Ramsey is employed as foreman of the defendants' shipping department and is in charge of packing and shipping the defendants' products. In addition to his duties in the shipping department, he performs other small tasks about the plant, such as turning on a thermostat for heating the building and making minor repairs. A telephone connected with the switchboard in the plant is located in the apartment. After regular hours in the plant, this telephone is on a direct line into the apartment and is the only telephone in operation in the building.

8. While William Ramsey spends his time at night on the defendants' premises, he is not hired for the purpose of a night watchman. There is no evidence that he is required to periodically inspect the premises at night.

9. On or about September 24, 1942, the defendants, with Mr. Ramsey's consent, placed Mr. Ramsey on a weekly salary basis of $25 per week. Prior to this time, he was employed by defendants on an hourly basis at the rate of 40¢ per hour for forty hours and 60¢ per hour for time in excess of forty hours per week. His maximum workweek had been fifty-two or fifty-three hours. On June 10, 1943, Mr. Ramsey's salary was increased by the defendants to $27.50 per week; on January 4, 1945, to $30 per week; and on November 15, 1945, to $35 per week. In addition to his weekly salary, the defendants give Mr. Ramsey the

advantage of the use of the apartment. The defendants do not consider the use of the apartment as being worth a certain sum of money in fixing the amount of Mr. Ramsey's compensation. He does not punch a time card.

10. Helen Ramsey, wife of William Ramsey, has been employed since 1943 by the defendants. Her regular duties consist of cleaning the girls' restrooms, for which she has always been paid the sum of $6 per week. She spends six to eight hours per week in performing this work. She does not punch a time card.

11. In addition to the work mentioned in the preceding special finding, Mrs. Ramsey also packages shelled popcorn for the defendants. This work, which is performed in the basement of the defendants' plant, is a regular part of the defendants' business; the packaged popcorn being sold and delivered by the defendants to their customers. The popcorn and materials for packaging are owned by the defendants. While there are no fixed and regular hours for the packaging of popcorn by Mrs. Ramsey, the time for performing this work being largely a matter of her convenience, Mrs. Ramsey puts in a sufficient amount of time at this work to keep the defendants supplied with packaged popcorn.

12. For her work in packaging shelled popcorn, the defendants pay Mrs. Ramsey on a piecework basis at the rate of 7½¢ per case. She packages an average of fourteen cases per hour. During those weeks between July 4, 1946, and April 17, 1947, in which Mrs. Ramsey packaged popcorn for the defendants, her gross earnings from this source ranged from $5.70 to $46.80 per week. While Mr. Ramsey and others sometimes helped Mrs. Ramsey in packaging popcorn, the evidence does not establish the amount of work performed or the amount of time so spent by these persons, or that they were compensated by Mrs. Ramsey.

13. Prior to March, 1944, Mary Wirzbicki worked in the defendants' plant on an hourly basis with time and a half for hours in excess of forty hours per week. Since March, 1944, she has been employed on a weekly salary basis by the defendants as an operator on a PBX board in the defendants' office. Initially, her salary for this work was fixed at $18 per week. After a series of increases, it is now $35 per week.

14. Marjorie Wyman has been employed by the defendants in their office since March 18, 1943. Her duties include bookkeeping and maintaining records of the number of hours worked by defendants' employees. She was hired at a salary of $20 per week; this amount being arrived at by computing her regular pay for forty hours, plus overtime for the extra two hours. After several increases, her salary was $40.00 per week at the time of the trial.

15. Jean Heffner was employed in the defendants' office at a salary of $25 per week for three or four months during 1946. The nature of her work is not disclosed by the evidence, and she is no longer employed by the defendants.

16. As a method or formula for determining the amount of the weekly salary at the time when the employees Peter Ghiringhello, Richard Kisicki, Nicholas R. Lippold, William Ramsey and Mary Wirzbicki were changed from an hourly to a weekly basis, the defendants computed the average hours of work per week for each employee over a period made up of ten or more weeks immediately preceding the change. The amount of weekly salary was then fixed by calculating each employee's pay at his then prevailing regular rate for forty hours plus time and a half for hours in excess of forty hours per week. To this result, the defendants added sums varying from about $2 to $5 per week to establish the amount of the weekly salary. The change from an hourly to a weekly basis was not solicited by the employees, and the weekly rates were set by the defendants prior to consultation with the employees and then submitted to them before being put into effect.

17. With the exception of Mrs. Ramsey's work in respect to the packaging of popcorn, the defendants' employees who

are presently involved in this case are employed under contracts or working agreements for workweeks of variable or fluctuating hours at a fixed weekly compensation.

18. The defendants are not maintaining records showing the straight time and overtime hours, the regular and overtime hourly rates of pay, and the total weekly straight time and overtime earnings for the employees involved in this case.

19. While the employees involved in this action, except William and Helen Ramsey, punch time cards, these hourly records are not considered by the defendants in computing the weekly compensation of the employees. There were no discussions with the employees relative to their hourly rates of pay when increases were made in the weekly salaries.

20. All employees involved in this action receive their weekly pay in envelopes showing only the total earnings for the week, deductions for social security and withholding taxes, and the net amount. All, except William and Helen Ramsey, punch time cards. All are paid for vacations and holidays. None have any written contract with the defendants fixing the hours of work or hourly rate of pay; nor were any of these employees able to testify as to their hourly rate.

21. The defendants, at the time of the trial, were in the process of organizing a corporation to carry on their business. Stock in this corporation, when issued, will be held by the same persons who are operating the business as a partnership, and these persons will be officers of the corporation. The employees now involved will be employed by the corporation in the same type of work and under the same arrangements as to hours and methods of pay. No point over the incorporation of the business has been raised or argued by the defendants.

## Opinion.

Relevant sections of the Fair Labor Standards Act of 1938 will, at the outset, be set forth before approaching a determination of the issues in this case.

Section 6(a) (3) of the Act, 29 U.S.C. A. § 206 (a) (3) provides:

"Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—

"(3) After the expiration of seven years from such date, (the effective date of this section) not less than 40 cents an hour, or the rate (not less than 30 cents an hour) prescribed in the applicable order of the Administrator issued under section 208 of this title, whichever is lower, * * *"

Section 7(a) (3) of the Act, 29 U.S.C. A. § 207 (a) (3) provides that:

"No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce— * * *

"(3) for a workweek longer than forty hours after the expiration of the second year from such date (the effective date of this section), unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

Section 11(c) of the Act, 29 U.S.C.A. § 211(c), requires that:

"(c) Every employer subject to any provision of sections 201–219 of this title or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of sections 201–219 of this title or the regulations or orders thereunder."

Sections 15(a)(1), 15(a)(2) and 15(a) (5) of the Act, 29 U.S.C.A. §§ 215(a) (1), 215 (a)(2) and 215(a)(5) provide:

"(a) After the expiration of one hundred and twenty days from the date of en-

actment of sections 201–219 of this title, it shall be unlawful for any person—

"(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206, or section 207 of this title, or in violation of any regulation or order of the Administrator issued under section 214 of this title; except that no provision of this chapter shall impose any liability upon any common carrier for the transportation in commerce in the regular course of its business of any goods not produced by such common carrier, and no provision of this chapter shall excuse any common carrier from its obligation to accept any goods for transportation;

"(2) To violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title;"

"(5) to violate any of the provisions of section 21(c) of this title, or to make any statement, report, or record filed or kept pursuant to the provisions of such section or of any regulation or order thereunder, knowing such statement, report, or record to be false in a material respect."

 The foregoing and other provisions of the Act must be read into, and treated as being a part of, every contract of employment to which the Act applies. Walling v. McKay, et al, D.C.Neb., 70 F. Supp. 160; Northwestern Yeast Co. v. Broutin, 6 Cir., 133 F.2d 628. Private agreements between an employer and employee which have the effect of limiting or abrogating the scope or purpose of the Act will not be upheld. Kappler v. Republic Pictures Corp., D.C.Iowa, 59 F.Supp. 112, affirmed 8 Cir., 151 F.2d 543, 162 A. L.R. 228. And amounts due an employee under the Act may not be compromised by the payment of a lesser amount. D. A. Schulte Inc. v. Gangi, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114, 167 A.L.R. 208; Strand v. Garden Valley Telephone Co., D.C.Minn., 51 F.Supp. 898. See also Brook-lyn Savings Bank v. O'Neil, 324 U.S. 697, where the court, at page 704, 65 S.Ct. 895, 900, 89 L.Ed. 1296, said:

"It has been held in this and other courts that a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy. (citing cases) Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate."

Expressly admitting that they are subject to the Fair Labor Standards Act, the defendants rest their defense primarily upon the contention that the employment of all of the employees complies with the Act. To sustain this contention, the defendants rely upon the Supreme Court's decision in Walling v. A. H. Belo Corp., 316 U.S. 624, 62 S.Ct. 1223, 86 L.Ed. 1716.

In the Belo case, as in the instant one, the employees worked irregular hours each week and were paid fixed weekly salaries. They received vacations with pay, full pay during illnesses, and time off for attending to personal affairs without deductions from their pay. However, the contracts of employment or working agreements, which were there upheld by the Supreme Court, are clearly and readily distinguishable from those which this court must now consider. The Belo contracts were in the form of letters stating terms which were agreed to by the employees. To summarize from the Supreme Court's opinion in 316 U.S. at page 628, 62 S.Ct. 122, 86 L.Ed. 1716, these contracts provided that after October 24, 1938, the employee's basic rate of pay would be so many cents per hour for the first forty-four hours each week, and that for time over forty-four hours each week the employee would receive for each hour of work not less than one and one-half times such basic rate, with a guaranty by the employer that the employee would receive weekly, for regular time and for such overtime as the necessities of the employer's business demanded, a sum not less than $40.

We especially note the following language from page 629 of 316 U.S., at page 1226 of 62 S.Ct. of the Supreme Court's opinion:

"When the employee worked enough hours at the contract rate to earn more than the guaranty, the surplus time was paid for at the rate of 150% of the hourly contract wage. If the employee received an increase in pay, the hourly rate and weekly rate were readjusted."

■ That situation does not exist in the present case where the employees, regardless of the number of hours worked in any one week, receive the same amount of pay. Here, the employees' weekly earnings are controlled entirely by their weekly salaries and in no way by the hours of work.

The court concludes that the contracts of employment now involved may not be sustained under authority of the Belo case. In reaching this conclusion, we are not unmindful of the Supreme Court's language that:

"When employer and employees have agreed upon an arrangement which has proven mutually satisfactory, we should not upset it and approve an inflexible and artificial interpretation of the Act which finds no support in its text and which as a practical matter eliminates the possibility of steady income to employees with irregular hours. Where the question is as close as this one, it is well to follow the Congressional lead and to afford the fullest possible scope to agreements among the individuals who are actually affected. This policy is based upon a common sense recognition of the special problems confronting employer and employee in businesses where the work hours fluctuate from week to week and from day to day. Many such employees value the security of a regular weekly income. They want to operate on a family budget, to make commitments for payments on homes and automobiles and insurance. Congress has said nothing to prevent this desirable objective. This Court should not." 316 U. S. at page 635, at page 1229 of 62 S.Ct.

■ This case comes under the rule that if an employee's employment is for a fixed weekly compensation for a workweek of variable or fluctuating hours, his "regular rate" of pay, within Section 7 (a) (3) of the Act entitling the employee to pay at not less than one and one-half times his regular rate for hours in excess of forty hours per week, must be determined by dividing the employee's fixed weekly compensation by the number of hours actually worked in any workweek. Overnight Transportation Co., Inc. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Landreth v. Ford, Bacon & Davis, Inc., 8 Cir., 147 F.2d 446; Hofer v. Federal Cartridge Corp., D.C.Minn., 71 F.Supp. 243. Of course, under this rule an employee's regular rate of pay will necessarily vary from week to week according to the number of hours worked. But nothing in the Act prohibits this fluctuation.

In an effort to distinguish the Missel case as being inapplicable, the defendants urge that when their employees were hired or placed upon the weekly salary basis, there then existed a set regular rate of 40¢ per hour in each instance, and that this was agreed upon and carried over or incorporated into the weekly salary. It is argued that the amount set as the weekly salary was, and still is, in each instance more than enough to compensate the employees for their regular and overtime hours, and that the employees have not, since the change from an hourly basis, put in more overtime than in the ten weeks immediately preceding the change. The defendants' reasoning rests, in part, upon two premises: (1) The Fair Labor Standards Act establishes a minimum rate of pay, and (2) the weekly salaries of the employees are higher than what would be their total weekly earnings if they were paid at the permissible statutory minimum of 40¢ per hour and 60¢ per hour for time in excess of forty hours per week. From these premises, the defendants invite the court to the conclusion that they are not violating the Act.

These contentions and arguments must be weighed and appraised more in the light of the realities inhering in the case and less from the standpoint of what the parties say that they have done or are doing.

Cf. Walling v. McKay, et al., supra; Bartels v. Birmingham, 67 S.Ct. 1547; Rutherford Food Corp. v. McComb, 67 S.Ct. 1473. In this case, the defendants, immediately after changing the employees to a weekly salary basis, discontinued maintaining a record showing regular and overtime hours and regular and overtime hourly rates of pay for the employees now involved. (That the employees, except Mr. and Mrs. Ramsey, continued to punch time cards, and that the defendants have thereby been able to maintain some check on their hours of work is not overlooked.) At the time of the trial, neither the employees nor the defendants were able to testify as to hourly rates of pay. It had never been discussed with the employees when increases were made in their weekly salaries, and there were, in each instance, at least three or four occasions when such increases were made. On direct examination the defendant Harold Lippold testified that the weekly rates were set prior to consultation with the employees and then submitted to them before being put into effect. On cross-examination this witness was asked: "Do these hourly records (evidently referring to time cards) kept for these employees have anything to do when you get down to figuring out the amount of compensation they receive week after week?" He answered: "No, no."

Viewing the case in its entirety, it is a legitimate inference that the matter of hours and hourly rates of pay were actually considered by the defendants only for the purpose of serving as a yardstick in arriving at the amounts of the initial weekly salaries. Thereafter, no further thought was given to hourly rates of pay and hours of work. Where a regular hourly rate is not expressly provided in the employment contract, or where the agreed compensation is not so allocated to a statutory workweek and to overtime hours so as to make the regular rate explicit in the contract, a court will not supply the deficiency by implication. Seneca Coal & Coke Co. v. Lofton, 10 Cir., 136 F.2d 359, 362; certiorari denied 320 U.S. 772, 64 S.Ct. 77, 88 L.Ed. 462.

In Walling v. Stone, 7 Cir., 131 F.2d 461, the defendant advanced arguments substantially the same as those now urged in the instant case. It was there sought to distinguish the Missel case on the ground that in that case there was no agreement and intention that the fixed salary should include compensation for overtime. In disposing of this contention, the court said:

"It is true that in our case the court found that the defendants and their employees intended that the fixed weekly rates of compensation cover regular and overtime work. Even so, that alone would not be sufficient to comply with the Act; such a general intention may not be transformed by implication into a specific intention that overtime be paid for at time and a half the regular rate, Missel case, supra. Consequently, the fixed salary contracts here involved did not comply with the provisions of § 7 of the Act." 131 F.2d at page 463.

In the Missel case, which was an employee's action for overtime, the employee worked irregular hours for a fixed weekly wage. Nothing above the weekly wage was paid because maximum workweeks, computed at the statutory minimum rates with time and a half for overtime for the weeks in question, did not require an addition to the weekly wage. The employer contended that the private right to contract for a fixed weekly wage was restricted only by the requirement that the wage paid should comply with the minimum wage schedule of section 6 of the Act, with overtime pay at time and a half that minimum, and that the Act did not preclude lump sum salaries in excess of the minimum. The Supreme Court, after expressly holding that the Act was designed to require payment of overtime at time and a half the regular pay, where that pay is above the minimum as well as where the regular pay is at the minimum, said:

"We now come to the determination of the meaning of the words 'the regular rate at which he is employed.' * * * we are concerned at this point only with the method of finding the regular rate

under the contract with respondent. Congress might have sought its objective of clearing the channel of commerce of the obstacles of burdensome labor disputes by minimum wage legislation only. We have seen that it added overtime pay. The wages for minimum pay are expressed in terms of so much an hour. Sec. 6(a)(1)—'Not less than 25 cents an hour' with raises for succeeding years or by order of the Administrator under Sec. 8. Cf. Opp Cotton Mills v. Administrator, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624. Neither the wage, the hour nor the overtime provisions of sections 6 and 7 on their passage spoke specifically of any other method of paying wages except by hourly rate. But we have no doubt that pay by the week, to be reduced by some method of computation to hourly rates, was also covered by the act. It is likewise abundantly clear from the words of section 7 that the unit of time under that section within which to distinguish regular from overtime is the week. 'No employer shall * * * employ any of his employees * * * (1) for a workweek longer than forty-four hours * * *.' Sec. 7(a)(1).

"No problem is presented in assimilating the computation of overtime for employees under contract for a fixed weekly wage for regular contract hours which are the actual hours worked, to similar computations for employees on hourly rates. Where the employment contract is for a weekly wage with variable or fluctuating hours the same method of computation produces the regular rate for each week. As that rate is on an hourly basis, it is regular in the statutory sense inasmuch as the rate per hour does not vary for the entire week, though week by week the regular rate varies with the number of hours worked. It is true that the longer the hours the less the rate and the pay per hour. This is not an argument, however, against this method of determining the regular rate of employment for the week in question. Apart from the Act, if there is a fixed weekly wage regardless of the length of the workweek, the longer the hours the less are the earnings per hour. This method of computation has been approved by each circuit court of appeals which has considered such problems. (Citing cases) It is this quotient which is the 'regular rate at which an employee is employed' under contracts of the types described and applied in this paragraph for fixed weekly compensation for hours, certain or variable.

"Petitioner invokes the presumption that contracting parties contemplate compliance with law and contends that accordingly there is no warrant for construing the contract as paying the employee only his base pay or 'regular rate,' regardless of hours worked. It is true that the wage paid was sufficiently large to cover both base pay and fifty per cent additional for the hours actually worked over the statutory maximum without violating section six. But there was no contractual limit upon the hours which petitioner could have required respondent to work for the agreed wage, had he seen fit to do so, and no provision for additional pay in the event the hours worked required minimum compensation greater than the fixed wage. Implication cannot mend a contract so deficient in complying with the law. This contract differs from the one in Walling v. Belo Corp., [316 U. S., page 624, 62 S.Ct. 1223, 86 L.Ed. 1716] where the contract specified an hourly rate and not less than time and a half for overtime, with a guaranty of a fixed weekly sum, and required the employer to pay more than the weekly guaranty where the hours worked at the contract rate exceeded that sum." 316 U.S. at pages 579–581, 62 S.Ct. 1220, 86 L.Ed. 1682.

In Carleton Screw Products Co. v. Fleming, 8 Cir., 126 F.2d 537, 539, the employer contended that Section 7 of the Act (requiring that overtime be compensated for at a rate of not less than one and a half times the regular rate at which the employee is actually employed) did not apply to the employer because it was paying in excess of the minimum wage prescribed by Section 6 for the statutory workweek and one and a half times that minimum for overtime hours. In overruling these contentions, Circuit Judge Gardner said: "This

provision (Section 7) imposes a penalty on overtime work regardless of what the rate of compensation may be, so that overtime work will be more expensive to the employer. The Act affects both wages and hours. It does not absolutely prohibit employing workers longer than the stipulated minimum of hours, but requires extra pay for overtime, thus making overtime more costly to the employer. * * * We think it clear that Section 7 is a regulation of hours, and that the regular rate is not the minimum rate but is the rate which the employee is actually paid. * * * We conclude that the Act is not limited in its effect to employees receiving less than the minimum wage prescribed." 126 F.2d at pages 539, 540, 541.

█ This court concludes that the contracts of employment now in effect between the defendants and the employees involved in this case are in reality contracts of employment for workweeks of variable or fluctuating hours at a fixed weekly compensation. Accordingly, each employee's regular rate of pay, for purposes of computing overtime, must be determined by dividing the employee's fixed weekly compensation by the number of hours actually worked in each workweek. In the absence of compliance with this rule, the employment contracts or working agreements now in effect between the defendants and these employees evade and violate the Fair Labor Standards Act. That the employees are satisfied is immaterial. These contracts are affected with public, as well as private, interests. They may properly be labeled "private-public" contracts.

█ There is no merit in the defendants' position that Mrs. Ramsey is, in respect to her work in packaging popcorn, an independent contractor for purp ses of the Act. The economic realities do not justify this conclusion. Cf. Walling v. McKay, supra; Walling v. American Needlecrafts, 6 Cir., 139 F.2d 60. The Act applies to employees who are compensated on a piecework basis, United States v. Rosenwasser, 323 U.S. 360, 65 S.Ct. 295, 89 L.Ed. 301, and the Administrator's regulations contemplate that an employer's books shall plainly and objectively show the hours worked even though the employee is paid on such basis. Walling v. Panther Creek Mines, Inc., 7 Cir., 148 F.2d 604.

█ Mrs. Ramsey is paid $7\frac{1}{2}$¢ per case for packaging popcorn and averages fourteen cases per hour. Thus, her hourly earnings from this source amount to $1.05 per hour. During the period of time between July 4 and December 26, 1946, there were five weeks in which her earnings from this work were $37.65 or more per week. By process of mathematical computation, it is evident that during these weeks the time spent by her in packaging popcorn and cleaning restrooms must have exceeded forty hours per week. The defendants' testimony that they have at times observed Mr. Ramsey and others helping Mrs. Ramsey with her work in packaging popcorn does not attempt to fix the amount of time spent or work performed by those other than Mrs. Ramsey. No record is maintained by the defendants showing her hours of work. Under these circumstances, the court will not indulge in a presumption that Mrs. Ramsey's hours of work do not exceed forty hours per week. We conclude that her earnings from piecework wages must be included in computing her statutory regular rate of pay, Walling v. Harnischfeger Corp., 325 U.S. 427, 65 S.Ct. 1246, 89 L.Ed. 1711, and that the defendants are violating Section 7 of the Act by compensating Mrs. Ramsey on only a straight time piece rate basis. Cf. Walling v. Jacksonville Paper Co., D.C.Fla., 69 F.Supp. 599.

█ Mr. Ramsey spends his time at night on the defendants' premises where he has an apartment. So far as appears from the evidence, it may fairly be inferred that he ordinarily has a normal night's sleep, and that his time at night is his own for purposes of relaxation and the pursuit of private activities. While there is a telephone in his apartment, there is no evidence that he is regarded as being subject to call. There is no showing that he is expected to periodically inspect the premises at night. Under the circumstances, the time so spent at night by Mr. Ramsey is not working time within the Fair Labor Standards Act. Muldowney v. Seaberg Elevator Co., D.C. N.Y., 39 F.Supp. 275. See also Interpretative Bulletin No. 13, paragraphs 6 and 7,

U. S. Department of Labor, Wage and Hour Division, Office of Administrator, November, 1940.

Section 516.2(a) of the Wage and Hour Administrator's Regulations on How to Keep Wage and Hour Records provides as follows: "Every employer shall maintain and preserve payroll or other records containing the following information and data on each and every employee to whom both Sections 6 and 7(a) of the Fair Labor Standards Act apply. (1) Name in full, (And on the same record, the employee's identifying symbol or number if such is used in place of name on any time, work, or payroll records) (2) Home address, (3) Date of birth if under 19, (4) Occupation in which employed, (5) Time of day and name of the day on which the employee's workweek begins, (6) (i) Regular hourly rate of pay, and (ii) Basis on which wages are paid, (7) Hours worked each workday and total hours worked each workweek, (8) Total daily or weekly straight-time earnings or wages, (9) Total weekly overtime excess compensation, (10) Total additions to or deductions from wages paid each pay period, (11) Total wages paid each pay period, (12) Date of payment and the pay period covered by payment."

The defendants do not assail the validity of these Regulations but deny that they have been violated. The defendants' records covering periods of time after Peter Ghiringhello, Richard Kisicki and Nicholas R. Lippold were placed on a weekly salary basis do not show the regular hourly rate of pay, the total daily or weekly straight time earnings, or the total weekly overtime excess compensation for these employees. Neither Mr. nor Mrs. Ramsey punched time cards prior to the trial, and no records as to their weekly hours of work have been maintained. The records as to the work of Mrs. Ramsey in packaging popcorn do not show her average hourly piece-rate earnings upon the basis of her total weekly hours divided into her total weekly earnings, or her total daily or weekly straight time earnings, or the total weekly overtime compensation.

We hold that the defendants are violating the record keeping Regulations which have been promulgated under the Act. Cf. Walling v. Reilly, D.C.Pa., 59 F.Supp. 740. That it may be difficult or commercially impractical for the defendants to keep proper records is immaterial. Walling v. Panther Creek Mines, Inc., supra.

An injunction is an extraordinary and harsh remedy. Hunnewell v. Cass County, 22 Wall. 464, 89 U.S. 464, 22 L.Ed. 752. It looks to the future and is designed to prevent or deter future injuries or noncompliance with the law. Relief by injunction is discretionary and may be denied where the court does not deem there is danger of a repetition of unlawful conduct. In this case, the employees are satisfied and it does not clearly appear that the defendants have acted in bad faith. Their violations have been inadvertent in nature.

## Conclusions of Law

1. The contracts of employment or working agreements now in effect between the defendants and the employees involved in this case violate and evade the Fair Labor Standards Act.

2. The defendants are violating the record keeping provisions of the Act and applicable Regulations promulgated thereunder by the Wage and Hour Administrator.

3. The issuance of a permanent injunction will at this time be postponed for thirty days to give the defendants an opportunity to bring their records into conformity with the Act and the Administrator's Regulations and to enter into satisfactory and lawful contracts with their employees. Walling v. Florida Hardware Co., 5 Cir., 142 F.2d 444.

If, at the end of that time, the defendants have not complied with the Act, an injunction will issue. Otherwise, the action will be dismissed at the defendants' costs.