W. Willard WIRTZ, Secretary of Labor, United States Department of Labor

v.

Louis H. SILBERTSON.

Civ. A. No. 30448.

United States District Court
E. D. Pennsylvania.

Jan. 30, 1963.

Ernest N. Votaw, Regional Atty., Marshall H. Harris, Dept. of Labor, for plaintiff.

George P. Walker, Robert M. Taylor, Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

Pursuant to the order[1] dated May 8, 1962, of Judge Kraft, a trial was held on October 1, 1962, on the issue "of whether defendant's alleged employees were or were not employees of defendant within the meaning of the Fair Labor Standards Act of 1938, as amended." 29 U.S.C.A. § 203. By filing requests for Findings of Fact and Conclusions of Law in December 1962 (Documents Nos. 19 and 23), the record was completed for decision of this issue.

The defendant was engaged in securing subscriptions for the Washington Star (Star). He had executed a written contract with the Star in 1956 under which he received a commission for each subscription sold. By this contract, the defendant was obligated to train the solicitors he used and to follow a sales presentation described by the Star. The Star told defendant what rates were to be charged, what orders were acceptable, the areas to call or not to call, and established the "ground rules." It furnished free to the defendant many facilities, including rooms, telephones, directories, cross-directories, lists of old subscribers, order blanks, pencils, pads, miscellaneous supplies and even janitor service.

Prospective solicitors were encouraged to apply for positions through advertisements placed in the Star which were prepared by the defendant and the Star's circulation manager. Responding to these advertisements, those interested would come to defendant's office in the Star Building, where they would complete an application and be interviewed by defendant or one of his assistants. If the prospect was found suitable, he executed a contract with the defendant which designated him as an independent contractor. It was explained to the new solicitor that he was not considered as an employee but as a self-employed person. No W-2 Form would be filed for him nor would the defendant deduct any taxes from his pay.

Next, the solicitor was given a brief period of training. By means of a telephone monitoring device, the new solicitor listened to the experienced solicitors making their sales presentations and dealing with prospects. He (the new solicitor) was given a sample sales presentation to follow and was taught how to complete the Star's order blanks.

After this training, the solicitor made calls from telephone company addenda, pages from cross-directories, stop orders or new customer lists from the Virginia Electric Company. This material was given to the solicitor by an assistant, or he could go to the desk and select lists from which to call. Some of these lists had been marked by Star routemen. The areas in which the solicitors made their calls were, in fact, prescribed by the lists given to them, markings on certain lists made from time to time by Star routemen, and oral directions given the solicitors by defendant and his assistants.

After calling the names on these lists, the solicitor crossed out those names he had called and returned the list to defendant or his assistants. If he had been successful and sold a subscription, he completed an order form and gave it to an assistant.

Solicitors could sell to anyone, but generally confined their solicitations to calling those lists described above. Calls were made to the surrounding areas served by the Star in the District of Columbia, Virginia and Maryland. Toll calls were not allowed, nor were certain areas of the District of Columbia to be called. Most calls were made from the defendant's office in the Star Building, but solicitors could, and some did, make calls from home.

Each subscription given to the defendant was sold by him to the Star. For each subscription purchased, the defendant paid the solicitor a flat commission. The only deduction from the solicitor's checks was the result of "kill orders"[2]

---

1. Document No. 8.

2. Subscriptions the Star would not handle because of prior experience with those customers or the geographical area, etc.

or from subscriptions which were later rejected by the subscriber.

Some of the solicitors had other employment and there was no restriction upon such additional employment. Several testified that they solicited to supplement their income and considered it a part-time job. They were free to come and go as they wished and there were no required hours or days to work. No time records were kept when they worked. The depositions reveal that there were from 10 to 15 solicitors calling each evening, with a fewer number calling during the day.

Supervision consisted of requests to sell more subscriptions, to call certain areas and not others, plus those other activities described herein. Occasionally defendant called meetings, on little or no notice, to pass on information. Attendance was not required at these meetings and the subject matter of the meetings would be communicated to the absent solicitors by the assistants.

Certain solicitors were designated as assistants. Their duties were of a general supervisory nature. They interviewed and trained new solicitors, took care of the office, and acted in the chain of command. When they were without orders for a situation, they used their own discretion. Assistants received up to $20.00 per week, in addition to their commissions, for these extra duties, upon which they paid their own taxes.

Mr. Silbertson testified that he had no control over the solicitors, could not fire them (but could refuse to "buy" orders from them), could not regulate their hours, days or time of work, the place of performance or methods used to obtain subscriptions. He paid the solicitors by check, prepared for him by an accounting service and charged against an account labelled "Subcontracting Services." Defendant also stated that there was a large turnover of solicitors.

Silbertson conducts similar operations in Philadelphia and Cincinnati and, while the Washington branch was in operation, visited it approximately every other week.

The depositions of five solicitors were taken.[3] Only one, Miss Helen DeMuth, testified that she had to work prescribed hours and perform exactly as told. She stated that she worked from 9 A.M. to 9 P.M. six days a week, from March 1960 to August 1960, and in that period earned $480.85. She considered herself as an employee.

Mr. Graves, who was sent by the defendant and the Star to other towns to solicit, testified that he solicited to supplement his income and that he never considered it as other than a part-time job.

Dolores Howell solicited subscriptions to make a living. She worked six days a week from 9 A.M. to 6 P.M. daily and was an assistant.

Mary Joyner solicited for over 2½ years, every evening and on Saturdays. She did this to supplement her income.

Anita Dodd solicited subscriptions from 1956 to 1961. Initially, she worked a full day from 9 to 5 and then changed her work to a period from 3 to 9 P.M. She left when her other employment occupied too much of her time to continue soliciting. She considered herself an employee of the Star.

The Fair Labor Standards Act (F. L. S. A.) defines "Employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee * * *."[4], an "Employee" to include "any individual employed by an employer,"[5] and "Employ" includes "to suffer or permit to work."[6] Mr. Justice Black, then a Senator, stated that this is "the broadest definition that has ever been included in any one Act."[7]

---

3. Documents Nos. 15–19.

4. 29 U.S.C.A. § 203(d).

5. 29 U.S.C.A. § 203(e).

6. 29 U.S.C.A § 203(g).

7. 81 Cong.Rec. 7657, 75th Cong., 1st Sess. (1937); see, also, United States v. Rosenwasser, 323 U.S. 360, 362, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1945), where it is said: "A broader or more comprehensive

■ The F. L. S. A. is part of the social legislation enacted during the 1930's and of the same general character as the National Labor Relations Act and Social Security Act. In the absence of a factually similar decision defining "employee," as it is used in the F. L. S. A. (29 U.S.C.A. § 203 ff.), decisions that define the coverage of the employer-employee relationship under the above-mentioned Acts are persuasive in the consideration of similar coverage under the F. L. S. A.[8]

■ There is no simple, uniform, and easily applicable test which the courts use to determine whether or not a person is an employee or independent contractor. The traditional common law tests are not controlling.[9] The term "employee" "must be understood with reference to the purpose of the Act and the facts involved in the economic relationship." [10]

■■ The purpose of the Act [11] is to correct, as rapidly as possible, conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and the general well-being of the workers. It is to achieve, in those industries within its scope, certain minimum labor standards.[12] Further, a liberal construction is given to the Act, since it is remedial, but each case must stand on its own facts.[13]

■ In this relationship between Silbertson and the various solicitors, the following facts appear:

1. The defendant did exercise control over these solicitors. This control consisted of the defendant's hiring techniques, reports of the day's sales made by each solicitor, the crossed-out names of those people they called, dissemination of information through meetings, through the assistants, or from the defendant personally. Additionally, he, either independently or at the request of a routeman of the Star, would prescribe what areas to call or not to call and furnished lists of those areas in which the solicitors were to call. Silbertson established the telephone procedure to be used by the solicitors and set their commission rates. The solicitors had no authority to vary the terms upon which the subscriptions were sold and could only sell on those terms prescribed by defendant and the Star. Although not complete, the defendant did have some control over the means of accomplishing the result.

2. There was little opportunity for profit or loss. The average solicitor received only a commission on those sales he made. He received no bonus, overtime, or extra commissions and could not go into areas on lists assigned to other solicitors. The commission rate was set by the defendant. The only "profit" the solicitors could earn was their commission; the only loss would be a loss of their time spent in unsuccessful solicitation.

3. The solicitors had no investment in the facilities. Every piece of equipment necessary to their operation was furnished by either the defendant or the Star. The solicitors did not use any capital.

---

8. Rutherford Food Corp. v. McComb, 331 U.S. 722, 723, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947), rehearing denied, 332 U.S. 785, 68 S.Ct. 29, 92 L.Ed. 368; United States v. Silk, 331 U.S. 704, 713–714, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947).

9. National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 120, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).

coverage of employees within the stated categories would be difficult to frame."

10. Id., p. 129, 64 S.Ct. p. 859.

11. See 29 U.S.C.A. § 202(a) and (b).

12. Mitchell v. Robert DeMario Jewelery, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

13. Richter v. Barrett, 173 F.2d 320, 324 (3rd Cir. 1949).

4. This relationship was more nearly permanent. Although the depositions indicate that there was a large turnover of solicitors, the five who testified had been engaged in this operation, either full or part time, from six months to six years. As to these solicitors, I find that the relationship was more nearly permanent and, hence, more indicative of an employer-employee relationship than of a contractee-independent contractor relationship.

5. Little skill was required. The solicitors learned the general technique in about an hour. They followed a format prepared by the defendant and the Star. There were no decisions of any consequence for them to make. About the only requirements for a solicitor are a pleasant voice, enough sales ability to sell a $4.00 newspaper subscription, and perseverance.[14] These skills are not very great and tend to indicate an employer-employee relationship.

■ These five indications, supra, are those set forth in United States v. Silk, 331 U.S. 704, 716, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947),[15] and lead to the conclusion that this was an employer-employee relationship. The solicitors performed essentially routine work, common for this type of business. They acted as a part of the business. When an individual regularly performs tasks essentially of a routine nature and that work is a phase of the normal operations of that particular business, the Supreme Court of the United States will ordinarily regard him as an employee under the F. L. S. A.[16] The defendant has shown no good reason why these solicitors should not be so regarded.

■ The contractual designation of the solicitors as independent contractors in this case is not persuasive. Where the usual work of an employee is performed, the label "independent contractor" will not deprive the worker of his employee status.[17]

■ The defendant emphasizes the right to control the manner and means of work as the test. This is inconclusive under the F. L. S. A., since it is only one factor considered by the court.[18] Further, even if these indicia did not point to an employee-employer relationship and if the relationship was doubtful, coverage is then to be determined broadly, by reference to the underlying economic realities, rather than by traditional rules governing legal classification of employee-employer and contractee-independent contractor.[19] Justice Reed answered the defendant's argument concerning control in Bartels v. Birmingham, 332 U.S. 126, 130, 67 S.Ct. 1547, 1549, 91 L.Ed. 1947 (1947), wherein he stated:

"Obviously control is characteristically associated with the employer-employee relationship, but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service."[20]

If we assume that there is some doubt of the trial judge's conclusion that these

---

14. The testimony indicates that interest in the work on the part of solicitors is also desirable, but such interest in the work is essential for success in doing any job, whether it be as an independent contractor or employee.

15. Although Silk involved the collection of social security taxes, these indicia may be considered in a F.L.S.A. case. See Rutherford, supra note 8, 332 U.S. p. 723, 67 S.Ct. p. 1473.

16. Mitchell v. Strickland Transportation Co., 228 F.2d 124, 127 (5th Cir. 1955).

17. Rutherford, supra note 8, p. 729 of 331 U.S., p. 1476 of 67 S.Ct.

18. Mitchell v. John R. Crowley & Bro., Inc., 292 F.2d 105 (5th Cir. 1961).

19. Walling v. Rutherford Food Corp., 156 F.2d 513, 516 (10th Cir. 1946).

20. Bartels, like Silk, was a social security tax case, but its definitions are also persuasive under the F.L.S.A. See Rutherford, supra.

solicitors are employees under the Silk case tests as stated above, then the question becomes, "as a matter of 'economic reality' are they dependent upon this enterprise?"[21]

The five solicitors who were deposed had been engaged in this operation for the periods of time stated above. They testified that they worked regularly, usually six days a week, for at least several hours a day. The assistants received extra compensation, varying in amounts up to $20.00 per week. Only the earnings of Miss DeMuth are shown in the record. Soliciting subscriptions was primarily a means for these five to supplement their incomes and, generally, they considered it only as a part-time job.

Under the concept of "economic reality," other part-time workers who chose their own working hours have been held to be employees within the scope of the Act.[22] Viewing all the activities of these five solicitors, their manner of work, time devoted to soliciting, the duration of their activities as solicitors, and the financial remuneration they received, the trial judge concludes that they were economically dependent upon this operation under the language of the cases cited in footnotes 20-22. Therefore, under this test too, the solicitors are employees within the meaning of the Act.

Although the cases cited by the defendant do stress the right to control, which is emphasized by him, they are cases arising under the National Labor Acts, where the courts first apply the technical and traditional concepts of employee-employer. Even in such cases, the courts are not confined to these concepts, however, since they may also take into account relevant economic and statutory considerations in determining who are employees.[23] Any objection to the "economic reality" test must have more foundation than is presented here. The Supreme Court has applied this test in social security tax cases,[24] N. L. R. A. cases,[25] and in the F. L. S. A. cases cited herein. In view of the test's long use and endorsement by the Supreme Court, this court has no right to disregard it.

Plaintiff's requests for Findings of Fact 1–11, 12–17, and 19–22 are affirmed and #3 is affirmed as modified.[26]

Plaintiff's requests for Conclusions of Law 1–8 are affirmed.

Defendant's requests for Findings of Fact 1, 2, 4, 9, 11 and 13 are affirmed and 3, 5, 14 and 15 are affirmed as modified.[27]

21. In Goldberg v. Whitaker House Coop., 366 U.S. 28, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961), Justice Douglas decided that homeworker members of a cooperative were employees for purposes of the F.L.S.A. The Coop. was bona fide and operated as any other cooperative. Under the more traditional tests, it is doubtful whether the member workers of the Coop. would have been employees, but under the concept of economic reality, Justice Douglas held they were employees for the purposes of the F.L.S.A.

22. See Goldberg v. Whitaker House Coop., supra; see, also, Walling v. Lippold, 72 F.Supp. 339, 350 (D.C.Neb.1947). If either of the parties in this case had produced more evidence on the relationship between the personnel of the Star and the solicitors, it might be that their solicitors were "employees" of the Star under 29 U.S.C.A. § 203(e), in view of the "economic reality test."

23. National Labor Relations Board v. E. C. Atkins & Co., 331 U.S. 398, 403, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947).

24. Bartels v. Birmingham, supra.

25. National Labor Relations Board v. E. C. Atkins & Co., supra note 23.

26. The word "was" is substituted for the word "is."

27. The words "designating them" are inserted in the third line of #3 before the word "as."
The words "Most of" are inserted at the beginning of #5.
The words "who was deposed" are inserted after the word "solicitor" in the first line of #14.
The words "Silbertson's practice was to furnish" are substituted for the first four words of #15.

Defendant's requests for Conclusions of Law are denied.

Plaintiff is entitled to judgment of liability in an order holding that these five solicitors were employees within the meaning of the F. L. S. A., 29 U.S.C.A. § 203(e). If the defendant submits an appropriate order within ten days, the certification provided for under 28 U.S.C.A. § 1292(b) may be included in the order. Plaintiff may also submit its suggested form of order.