Willie HAYWOOD, et al., Plaintiffs,

v.

Carson B. BARNES, et al., Defendants.

No. 83–66–CIV–8.

United States District Court,
E.D. North Carolina,
Wilson Division.

Feb. 13, 1986.

572

Robert J. Willis, Billie R. Ellerbe, Farmworkers Legal Services of N.C., Raleigh, N.C., for plaintiffs.

Marcia H. Armstrong, George Mast, Mast, Tew, Armstrong & Morris, Smithfield, N.C., for defendants Carson B. Barnes, Barnes Farming Corp., Farm-Pak Products, Inc., Laurie Chancy and Maxine Barnes.

## ORDER

JAMES C. FOX, District Judge.

This is a class action originally brought by thirteen migrant farmworkers, initiated by complaint filed August 30, 1983.[1] Plaintiffs allege entitlement to relief under two statutes. First, plaintiffs seek recovery of unpaid minimum wages and overtime pay plus liquidated damages, under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et. seq.* Second, some of the plaintiffs seek relief for themselves and a class of others similarly situated under the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801 *et. seq.* In particular, class members have allegedly been aggrieved in four specifics:

1. Their housing was not in compliance with applicable federal safety and health standards. 29 U.S.C. § 1823.

2. Defendants did not provide them with the required written disclosures of the terms and conditions relating to the occupancy of the housing. 29 U.S.C. § 1821(c).

3. Defendants did not provide them with written itemized pay statements with the information required by 29 U.S.C. § 1821(d)(2), and

4. Defendants did not maintain the pay records required by 29 U.S.C. § 1821(d)(1).

Recovery by each class member of up to $500.00 in statutory damages for each violation is sought.

All of the plaintiffs are migrant farmworkers within the definition of that term as found in 29 U.S.C. § 1802(8).[2] They

---

1. An additional twenty-three persons have been allowed to intervene or join in this action as parties-plaintiff, at least as to some of the claims, pursuant to F.R.Civ.P. 24(a)(2) and 20(a) respectively, by orders dated November 29, 1983 and April 11, 1985.

2. This statute provides, in pertinent part, that:

were employed in commerce in agricultural labor by the defendants in or about late spring and summer of 1983 in Nash and Wilson Counties, North Carolina.

The defendants originally named in the complaint fall into two categories. The first—Carson Barnes, Maxine Barnes, Laurie Chancy, Barnes Farming Corporation and Farm-Pak Products, Inc. (the Barnes) —are owners and operators of the farms where plaintiffs worked and were housed. The remaining defendants were farm labor contractors utilized by the Barnes during the 1983 growing season. A consent judgment, approved by this court, April 3, 1984, reflects that plaintiffs and this second group of defendants have now resolved their differences, leaving the Barnes as the only remaining defendants.

Pending before the court are four motions by the plaintiffs: (1) for class certification of the AWPA claims, to which Magistrate Leonard has issued a memorandum recommending certification and to which the defendants have interposed numerous objections; (2) for leave to amend their original motion for class certification, to which the defendants have not responded; (3) for leave to amend their complaint and add several individual causes of action under the AWPA, to which the defendants have objected; and (4) for reconsideration of the scope of the magistrate's November 8, 1983, discovery order, essentially seeking additional discovery upon certification of the class, to which the defendants have objected. This opinion will address the class certification issues (1) and (2); a subsequent order will dispose of the remaining two issues. The class certification motions have been extensively briefed, orally argued, with evidentiary hearings conducted before both the magistrate and this court, thus, the matters are now ripe for resolution.

## I. THE CLASS TO BE CERTIFIED

Plaintiffs originally sought certification pursuant to F.R.Civ.P. 23(b)(3) of a class of:

> ... the term "migrant agricultural worker" means an individual who is employed in agricultural employment of a seasonal or other

All migrant farmworkers who were employed by the Barnes defendants and one or more farm labor contractor(s) used by any of the Barnes defendants at any time during the period from April 12, 1983 to August 1, 1983, who were housed in migrant farmworker temporary housing located in Nash or Wilson Counties, North Carolina, which was owned by any of the Barnes defendants and controlled by one or more of the farm labor contractors used by the Barnes defendants in that time period whose rights under 29 U.S.C. §§ 1821(1), 1821(2), 1821(c) and 1823 were violated by any of the defendants.

■ However, plaintiffs have subsequently moved to amend their motion for class certification to provide that the definition of the class should read: "all migrant farmworkers who were *used or* employed by the Barnes defendants...." (emphasis on the proposed wording change). Plaintiffs' motion is predicted on the fact that, unlike the alleged written terms and conditions disclosure, itemized pay statement and maintenance of pay record violations, the housing safety and health claims do *not* depend on the status of the Barnes defendants as joint employers of the plaintiffs under the AWPA. 29 U.S.C. § 1823 provides, in pertinent part, that:

> ... each person who *owns or controls* a facility or real property which is *used* as housing for migrant agricultural workers shall be responsible for ensuring that the facility or real property complies with substantive Federal and State safety and health standards applicable to that housing. (emphasis added).

This statute makes clear that, at least with regard to plaintiffs' housing claims, the liability of the Barnes is solely contingent upon their ownership or equitable interest in the farm labor camps used to house the named plaintiffs and class members in 1983. The discovery materials filed in this action to date establish beyond cavil that

> temporary nature, and who is required to be absent overnight from his permanent place of residence.

this prerequisite for liability under Section 1823 has been met. *See e.g.,* Deposition of Carson Barnes at 162.

Defendants do not oppose plaintiffs' motion and, accordingly, plaintiffs' motion for leave to amend their motion for class certification is GRANTED.

## II. DEFENDANTS' OBJECTIONS TO CLASS CERTIFICATION

### A. RULE 23 STANDARDS

■ Plaintiffs have sought class certification under F.R.Civ.P. 23(b)(3) and Magistrate Leonard has recommended that the class as defined by the plaintiffs be certified. In order for a suit to be maintained as a class action under Rule 23, plaintiffs must initially satisfy each of the four threshold requirements of Rule 23(a):

(1) the class must be so numerous that joinder of all members is impracticable;

(2) questions of law or fact common to the class must exist;

(3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) the representative parties must fairly and adequately protect the interests of the class.

Plaintiffs seeking to represent the class bear the burden of establishing that all four requirements are met. *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.,* 105 F.R.D. 125, 130 (D.Minn.1985). These prerequisites are mandatory and the failure to establish any one is fatal to a motion for class certification. *In re Asbestos School Litigation,* 104 F.R.D. 422, 427 (E.D.Pa. 1984).

If plaintiffs satisfy the requirements of Rule 23(a), they then must demonstrate that the action sought to be certified falls within one of the categories set forth in Rule 23(b)—in this case, 23(b)(3). In connection with this analysis, the burden of proof remains with the plaintiffs to establish sufficient factual information to enable the court to find that: (1) "questions of law

or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "a class action is superior to the other available methods for the fair and efficient adjudication of the controversy." *Id.*

Plaintiffs obviously contend they have met the four threshold requirements of Rule 23(a) as well as the two requirements of 23(b)(3). Defendants candidly concede that plaintiffs satisfy the numerosity, commonality and typicality prerequisites, but argue strenuously that plaintiffs have failed to meet the adequacy of representation requirements of Rule 23(a) and both prongs of 23(b)(3).

■ The court agrees with the plaintiffs that "the central issue raised in a motion for certification is whether a class action is appropriate, not the probability of plaintiffs' success on the merits of the substantive claims." *Chestnut Fleet Rentals, Inc. v. Hertz Corp.,* 72 F.R.D. 541, 543 (E.D.Pa.1976) *citing Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). Nonetheless, recent Supreme Court cases, culminating in *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), have intensified the burden upon the movant for class certification. A class action "may only be certified if the trial court is satisfied, *after a rigorous analysis,* that the prerequisites of Rule 23(a) have been satisfied." *Id.* at 161, 102 S.Ct. at 2373. (emphasis added). Clearly, *Falcon* requires the trial court to engage in an extensive factual analysis at the certification stage in order to satisfy itself that the requirements of Rule 23 have been met.

■ The parties have engaged in exhaustive discovery on the class certification issue, numerous depositions and exhibits have been presented for the court's review, and counsel have submitted extensive briefs. In sum, the court has before it a more than adequate record upon which to conduct the "rigorous analysis" mandated by *Falcon.*

Having thoroughly reviewed every piece of anecdotal and documentary evidence submitted to the court and having carefully considered in *de novo* fashion, the thoughtful oral and written arguments presented by counsel, the court finds the magistrate's recommendation, as elaborated upon in this opinion, correct and in accordance with law. Accordingly, for the reasons that follow, the magistrate's recommendation is accepted, plaintiffs' motion for class certification is GRANTED, and the class as previously amended and defined is certified pursuant to Rule 23(b)(3).

The court will now proceed to address defendants' objections *seriatim* within the context of the Rule 23 requirement under which it is raised. In addition, although defendants have conceded numerosity, commonality and typicality, a brief analysis of these elements will follow as well since the court is not obligated to accept defendants' concession absent a reasonable basis upon which to do so.

## B. THE THRESHOLD REQUIREMENTS OF RULE 23(a)

■ Prior to the consideration of the criteria set forth under Rule 23(a), the court must initially find that a precisely defined class exists, *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir.1976), and also that the class representatives are indeed members of the proposed class. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). These requirements are implicit prerequisites to the maintenance of any action under Rule 23. *Dirks, supra*, at 130–131.

■ In the case at bar, plaintiffs have precisely defined the class they wish to represent as all migrant farmworkers who were used or employed by the Barnes at a specific location, during a specific time frame, and who were injured in one of four delineated ways. Thus, the precisely defined class requirement is satisfied. *See Roman, supra*, at 1348.

■ · The second implicit criterion is also met. First, defendants do not contest the named plaintiffs' status in this regard. Second, the numerous affidavits and depositions of the original plaintiffs filed to date indicate they are all members of the class they seek to represent. *See e.g.,* Declarations of Willie Haywood, Nallie Hairston, Jr., Elbert Grays, Diane Sanders, Dennis Franklin and Marshall Miller attached to plaintiffs' December 9, 1983 Memorandum of Law in Support of Motion for Class Certification; Deposition of Larry Williams at 11–13; Deposition of Joe Lee Malima at 6–8.

### 1. *Numerosity*

■ Rule 23(a)(1) permits a class action only when "the class is so numerous that joinder of all class members is impracticable." No definite standard exists as to what size class satisfies the requirements of Rule 23(a)(1). *See Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). Courts have, however, certified classes composed of as few as eighteen, *Cypress v. Newport News General and Nonsectarian Hospital Ass'n.*, 375 F.2d 648, 653 (4th Cir.1967) and twenty-five members, *Philadelphia Electric Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452, 463 (E.D.Pa.1968).

■ Furthermore, the fact that the precise number of potential members of the class can not be ascertained does not bar class certification. *Meyer v. Citizens and Southern National Bank*, 106 F.R.D. 356, 360 (M.D.Ga.1985). It is not necessary that the members of the class be so clearly and completely identified that any member can be presently ascertained. *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir.1975). In fact, difficulty in immediately identifying all class members makes joinder more impractical and certification more desirable. *Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638, 645 (4th Cir. 1975). It suffices that it be apparent, either through direct evidence or a reasonable estimate of the numbers of the pur-

ported class, that the size of the class makes joinder impracticable. *In re Asbestos School Litigation,* 104 F.R.D. at 428. The decision as to whether joinder is impracticable is essentially a subjective determination based on expediency and the inconvenience of trying individual lawsuits. *Pabon v. McIntosh,* 546 F.Supp. 1328, 1333 (E.D.Pa.1982).

■ In the case at bar, defendant Carson Barnes testified that approximately 800 migrant laborers were employed by the Barnes from April 12—August 1, 1983 with 400–500 present on any given day. Although the depositions of the farm labor contractors would seem to imply a somewhat lesser figure, it remains obvious that the number of farmworkers involved exceeds several hundred. In addition, because of the low dollar amounts involved in each individual claim, a class action is the only economical and practical method in which to proceed. *See Dirks, supra,* at 131.

Accordingly, the court finds plaintiffs have satisfied the numerosity requirement. *See e.g. Aguirre v. Bustos,* 89 F.R.D. 645, 647–48 (D.N.M.1981) (class action of 60–100 migrant farmworkers certified under the Farm Labor Contractor Registration Act (FLCRA), 7 U.S.C. § 2041 (1982)).[3]

### 2. *Commonality*

■ Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." The requirement of commonality is aimed at determining whether there is a need for combined treatment and a benefit to be derived therefrom. *In re Asbestos School Litigation,* 104 F.R.D. at 428. This requirement has been liberally construed and "those courts that have focused on Rule 23(a)(2) have given it a permissive application so that common questions have been found to exist in a wide range of contexts." 7 Wright & Miller, *Federal Practice and Procedure:* Civil § 1763 (1972).

■ A common question is one which arises from a "common nucleus of operative facts" regardless of whether "the underlying facts fluctuate over the class period and vary as to individual claimants." *Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685, 690–91 (E.D.Pa.1977); *In re Corrugated Container Antitrust Litigation,* 80 F.R.D. 244, 250 (S.D.Tex.1978). Rule 23(a)(2) does not require that all questions of law or fact be common to every member of the class. *Beebe v. Pacific Trust Realty,* 99 F.R.D. 60, 65 (D.Or.1983). Indeed, a single common question is sufficient to satisfy the rule. *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982); *Simon v. Westinghouse Electric Corp.,* 73 F.R.D. 480, 484 (E.D.Pa.1977).

■ Furthermore, a class action will not be defeated solely because there are some factual variations among the members' grievances. *Patterson v. General Motors Corp.,* 631 F.2d 476 (7th Cir.1980), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed. 304 (1981); *Kirby Colony Furniture Co., Inc.,* 613 F.2d 696, 699–700 (8th Cir.1980). Nor is there a requirement that answers to common questions guarantee a determination of liability. *In re Asbestos School Litigation,* 104 F.R.D. at 429.

■ Here, common questions of law and fact do exist. All of the housing in which the workers lived was owned by the Barnes and similarly maintained during the period in question, suggesting common questions as to its adequacy. Indeed, it appears counsel for the defendants has so stipulated as to plaintiffs' claims arising under 29 U.S.C. § 1821(c) and 1823.

In addition, the payroll and pay statement claims raised by the plaintiffs also raise a number of common questions. One central issue is the status of the Barnes defendants and their farm labor contractors as the "joint employers" of the plaintiffs and proposed class members under the AWPA. *See* 29 C.F.R. § 500.20(h)(4). Defendants acknowledge the existence of this common question, and in fact, predicate their Rule 23(b)(3) argument on the contention that joint employment does not exist in

---

**3.** The FLCRA is the direct statutory predecessor of the AWPA.

this case. *See* discussion of this issue *infra* at 584–92. Other common questions include whether the pay statements given to the plaintiffs and the putative class members were sufficient to meet the requirement of 29 U.S.C. § 1821(d)(2) and whether defendants kept the written records required by 29 U.S.C. § 1821(d)(1).

Similar class actions to the one at bar have been certified in cases brought by migrant farmworkers charging violations under the FLCRA. *E.g., De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232–33 (7th Cir.1983); *Aguirre v. Bustos, supra.* Accordingly, since each member of the class alleges the same statutory violations arising out of essentially the same period of employment, the commonality requirement has been satisfied.

### 3. *Typicality*

Under Rule 23(a)(3), the claims of the representative parties must be typical of the claims of the class. The claim of a party is typical if it arises from the same event or course of conduct which gives rise to the claims of other class members and is based on the same legal theory. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d at 232; *Paskel v. Heckler*, 99 F.R.D. 80, 83–84 (E.D.Pa.1983); H. Newberg, *Class Actions* § 1115(b) at 185 (1977). The requirement is that plaintiff and each member of the represented group have an interest in prevailing on similar legal claims. Assuming such interest, the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of the class members, differences in the amount of damages claimed, or even differences in the availability of certain defenses against a class representative. *Zeffro v. First Pennsylvania Banking & Trust Co.*, 96 F.R.D. 567, 569 (E.D.Pa.1983); *Resnick v. American Dental Ass'n*, 90 F.R.D. 530, 539 (N.D.Ill.1981); *Edmondson v. Simon*, 86 F.R.D. 375, 380–81 (N.D.Ill.1980).

Thus, typicality does not require that the claims or defenses of the class representatives be identical or perfectly coextensive with the claims or defenses of the members; substantial similarity of legal theory will be sufficient even in the face of differences of fact. *In re Asbestos School Litigation*, 104 F.R.D. at 429–30; *Allen v. Issac*, 99 F.R.D. 45, 51 (N.D.Ill. 1983). The typicality requirement merely emphasizes that the class representatives "ought to be squarely aligned in interest with the represented group." Kaplan, "Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)", 81 Harv.L.R. 356, 387 n. 120 (1967) *quoted in* 5 H. Newberg, *Class Actions* § 8816 at 850 (1977). *See Also Steiner v. Equimark Corp.*, 96 F.R.D. 603, 609 (W.D.Pa.1983).

In the case at bar, the typicality requirement is fulfilled without difficulty. All of the named plaintiffs lived in the provided housing and worked with one of the farm labor contractors during the period in question. As in *De La Fuente, supra*, all of the major AWPA claims of the named plaintiffs are directed at the housing, payroll and disclosure practices of the defendants. 713 F.2d at 232. These practices affected in the same way, albeit perhaps in varying degrees, any migrant farmworker who came to work for the defendants. The practices complained of appear to have remained essentially unchanged throughout the spring and summer of 1983. All members of the putative class were allegedly subject to the same statutory violations pled.

Accordingly, the court finds that the named plaintiffs' claims and those of the proposed class are based on the same legal theories and the typicality requirement has been satisfied.

### 4. *Adequacy of Representation*

The final requirement of Rule 23(a) is that the "representative parties ... fairly and adequately protect the interests of the class." This inquiry focuses on two factors: (a) the qualifications, experience and conduct of plaintiffs' counsel and (b) the interest and involvement of the named plaintiffs in the litigation. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239,

247 (3d Cir.1975). The burden is on the defendant to demonstrate that the representation will be inadequate. *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.1982), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).

Defendants do not question the compentency or qualifications of plaintiffs' counsel. Indeed, plaintiffs are represented by experienced counsel who have previously been counsel in class action litigation and who certainly, as attorneys for Farmworkers Legal Services of North Carolina, have developed expertise in the area of migrant farmworkers' rights. Therefore, no doubt exists that plaintiffs' counsel are able to vigorously prosecute this action on behalf of the members of the class as they have done thus far on behalf of the named plaintiffs.

Defendants, instead, forcefully challenge the adequacy of the named plaintiffs as class representatives. Defendants assail the adequacy of the twelve plaintiffs advanced as representatives on four grounds, asserting that: (1) the criminal records of several of the plaintiffs render them undesirable as representatives; (2) plaintiffs have demonstrated a lack of conscientiousness in the prosecution of the action thus far; (3) their migratory nature makes it unlikely they will be able to remain sufficiently in touch with the court and counsel; and (4) plaintiffs have insufficient funds to represent the class.

Magistrate Leonard, in recommending plaintiffs' motion for class certification be granted, rejected the first three of defendants' four contentions; the fourth not having been presented to him. Because the magistrate's memorandum on these issues was thorough, incisive and persuasive, the court's discussion which follows will be brief and specifically incorporates the reasoning set out on pages 5–8 of Magistrate Leonard's memorandum and recommendation (M & R).

First, the court agrees with the magistrate when he states, "[o]bviously, a felony criminal record is not per se disqualifying as a class representative." M & R at 5. Neither the one case cited by defendants, *Leib v. 20th Century Corporation,* 61 F.R.D. 592 (M.D.Pa.1974), nor any other case researched by the court has ever rejected a putative class representative as inadequate based solely upon his criminal record. Incarcerated felons have long been certified as class plaintiffs in numerous cases. E.g., *Jones v. Diamond, supra; Dean v. Coughlin,* 107 F.R.D. 331 (S.D.N.Y.1985); *Arrango v. Ward,* 103 F.R.D. 638 (S.D.N.Y.1984); *Montcravie v. Dennis,* 89 F.R.D. 440, 443 (W.D.Ark.1981). Plaintiffs' adequacy must be assessed in light of their conduct in this or previous litigation, not based on a subjective evaluation of their personal qualifications as allegedly and tenuously evidenced by their prior criminal record. *Cf. Weinberger v. Jackson,* 102 F.R.D. 839 (N.D.Cal.1984); F.R.Evid. 404(b) (evidence of other crimes is not admissible to prove the character of a person).

As for defendants' argument that plaintiffs have demonstrated a lack of conscientiousness in the prosecution of this case, the court finds from the evidence that: (1) plaintiffs share a common interest with the putative class members; (2) each named plaintiff has a personal financial stake in the outcome of this litigation; (3) the named plaintiffs have consulted with their attorneys on a regular basis; (4) the named plaintiffs have reasonably and timely responded to defendants' requests for discovery; (5) ten of the named plaintiffs, including all three North Carolina plaintiffs, have appeared for depositions; (6) all of the plaintiffs have submitted either declarations or affidavits in support of the certification motion; (7) there is no showing that the representative parties cannot make practical decisions during the course of the lawsuit that would protect the interests of the class; (8) all of the plaintiffs, and with particularity the deposed plaintiffs, have indicated familiarity with the practices challenged and the essense of this litigation despite their general lack of for-

mal education;[4] and (9) there is no credible evidence that plaintiffs are unwilling to pursue this action or that they will disregard their duties as class representatives. *See Aguirre v. Bustos,* 89 F.R.D. at 648–49. Thus, the court agrees with the magistrate that plaintiffs have "carried their burden of showing the existence of named plaintiffs who have interests in common with those of class members, and understand the fundamentals of the litigation and are committed to it." M & R at 7–8.

 Defendants' argument that the migratory nature of plaintiffs bars them as class representatives is wholly without merit. Taking defendants' assertion to its logical conclusion, it would effectively eliminate class actions as a device to aid migrant farmworkers in the protection of their rights. By definition, all migrant farmworkers are transient and their work is seasonal; *ipso facto,* argue the defendants, they can never be class representatives. Since the AWPA clearly contemplates class actions by migrant farmworkers, it seems apparent defendants' contention was considered and rejected by Congress. As the magistrate found, migrant laborers are not "generically unsuit[ed] for class treatment." *Alvarez v. Joan of Arc,* 658 F.2d 1217 (7th Cir.1981).

Finally, with regard to the named plaintiffs' ability to finance this litigation, the court notes that normally the financial responsibility of class representatives is not examined. *See Sanderson v. Winner,* 507 F.2d 477, 479–80 (10th Cir.1974) *(per curiam), cert. denied,* 421 U.S. 914, 95 S.Ct. 1573, 43 L.Ed.2d 780 (1975); *Dirks, supra,* at 134. Instances where a court will do so generally involve classes consisting of members numbering in the thousands and tens of thousands. *Sanderson, supra* at 480. In such cases, the court is legitimately concerned with the named plaintiffs' ability to bear the costs of sending adequate notice to class members. *Id.* at 479–80. By contrast, the maximum potential

class in the case at bar numbers 800, with the actual class likely to be considerably less.

 In addition, plaintiffs have indicated that the cost of notice and other expenses incident to class certification can be advanced by the legal services program which represents the named plaintiffs. Since plaintiffs remain ultimately liable for such costs and otherwise would not be able to maintain this action, this specific advance is permissible and satisfies the adequacy requirement. *Rios v. Marshall,* 100 F.R.D. 395, 405 (S.D.N.Y.1983) (similar agreement by legal services to advance costs in migrant farmworkers case upheld). *See also George v. Beneficial Finance Co. of Dallas,* 81 F.R.D. 4, 7 (N.D.Tex.1977); *P.D.Q., Inc. of Miami v. Nissan Motor Corp.,* 61 F.R.D. 372, 378–79 (S.D.Fla. 1973).

Therefore, based on the aforesaid, the court finds the named plaintiffs have satisfied the adequacy of representation requirement and, thus, have met the threshold standards of Rule 23(a).

### C. RULE 23(b)(3)

Having determined that a class action brought by the named plaintiffs meets the Rule 23(a) prerequisites, the court must next consider whether the action falls within one of the categories of class actions described in Rule 23(b). Plaintiffs contend that the proposed class meets the third condition of 23(b) which requires that (1) common questions of law or fact raised by the litigation in which class determination is being sought predominate over individual questions and (2) class treatment be superior to other procedures available for handling the claims in question. Aside from an extensive factual analysis supporting a favorable finding under both prongs of 23(b)(3), plaintiffs cite as additional authority for their motion, a number of similar class actions by migrant farmworkers certified under 23(b)(3). *De La Fuente v. Stok-*

---

**4.** Class representatives are not required to possess detailed substantive knowledge of the nature of their lawsuit. *Foltz v. U.S. News and*

*World Report, Inc.,* 106 F.R.D. 338, 341 (D.D.C. 1984).

*ely-Van Camp, Inc.*, 713 F.2d at 233; *Rios v. Marshall*, 100 F.R.D. at 407–10; *Aguirre v. Bustos*, 89 F.R.D. at 649; *Cantu v. Owatonna Canning Co., Inc.*, 90 L.C. § 33, 965 at p. 49, 449–51 (D.Minn.1978).

Defendants object on a number of grounds to the magistrate's findings of predominance and superiority. These objections will be addressed below *seriatim.* In determining the merits of defendants' argument that the relevant criteria of Rule 23(b)(3) have not been satisfied, the court is guided by the standards enunciated by the Third Circuit Court of Appeals in *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 756–57 (1974) *(en banc), cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974):

> The predominance finding requires at a minimum the identification of the legal and factual issues, common and diverse, and an identification of the class members to which these relate.... The superiority finding requires at a minimum (1) an informed consideration of alternative available methods of adjudication of each issue, (2) a comparison of fairness to all whose interests may be involved between such alternative methods and a class action, and (3) a comparison of the efficiency of adjudication of each method.

*See also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 448 (3d Cir.1978), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Assuming the analysis of these factors is correct, this court has broad discretion to grant or deny class certification. *Id.*

### 1. *Predominance*

■ Although plaintiffs have established the existence of legal and factual issues common to class members, as is required by Rule 23(a)(2), they also must show that these common issues predomi-

nate for certification under 23(b)(3). *Rios v. Marshall*, 100 F.R.D. 407. In assessing whether common questions predominate, most courts have adopted a pragmatic approach, analyzing the basic elements of all civil claims [5], and emphasizing the efficiency of class treatment, the significance of common questions and whether class certification would result in the serious distortion of the lawsuit. *In re Asbestos School Litigation*, 104 F.R.D. at 431. *See also Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir.1977) *(en banc), cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). When "common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." Wright and Miller, *Federal Practice and Prodecure:* Civil § 1778 (1972).

Defendants contend that: (1) significant issues of liability would differ widely among potential class members and, therefore, individual not class issues predominate; (2) plaintiffs are seeking across-the-board damages for the class without proof of individual damages, thereby invoking an illegal "fluid recovery" concept of monetary relief; and most importantly, (3) the Barnes are not joint employers of the named plaintiffs and the putative class, thus, plaintiffs' posting of notices, itemized pay statements and maintenance of records claims must be dismissed.[6]

### (a). *Legal and Factual Issues Arising From the Claims*

To determine if the legal and factual issues arising from the claims asserted on behalf of the class predominate over individual issues, this court must examine the

---

5. These elements are: (1) violation of the law; (2) fact of injury; and (3) damages. *Bogosian v. Gulf Oil Corp.*, 561 F.2d at 454–56.

6. Defendants initially argued only that the joint employer issue was not susceptible to classwide treatment, that an individual inquiry into each farmworkers' status was required with the employment relationship between the plaintiffs

and defendants constantly varying depending upon the work performed and the supervisor controlling the work. Thus, defendants argued, individual not common issues predominated.

Subsequently, however, defendants extended this argument to categorically contend the Barnes were not joint or individual employers of *any* of the migrant farmworkers in 1983.

four areas in which classwide relief is sought. Again, because the magistrate's analysis in this regard was extensive and in accordance with law, the discussion on pages 9–13 of Magistrate Leonard's M & R is incorporated herein.

### (i) *Housing*

Plaintiffs' complaint alleges that class members have not been provided housing in compliance with substantive federal and state health and safety standards. Defendants argue that proof of this violation will require a day-by-day, room-by-room analysis of lodging at the Barnes' camps. A review of the evidence persuades the court otherwise.

The record is clear that the Barnes provided and maintained housing for all the migrant farmworkers who worked in the Barnes' fields during 1983. Unlike the one case cited by defendants to bolster their argument, *Stewart v. Winter, supra,* this case does not involve an inquiry into 82 separate county jail facilities; rather it involves an examination of conditions of property and facilities located in one central geographical area, owned and operated by one entity—the defendants.

Testimony from a number of farm labor contractors and their supervisors indicates that the Barnes' camps remained in essentially the same condition throughout the 1983 season. *E.g.,* Deposition of Ethel Beaver at 171–72; Deposition of Dorothy Williams at 57; Deposition of Lionel Beaver at 88; Deposition of John Edmond at 141. In addition, the sworn testimony and statements of several plaintiffs have identified conditions common to all occupants of the housing, which if proved, would constitute violations of a number of state and federal regulations. *E.g.,* Declaration of Willie Haywood (absence of heating in camp; lack of toilet paper in bathrooms); Declaration of Marshall Miller (bathroom inoperable and unsanitary); Deposition of

Alonzo Howell at 99–105, 155–160 (unsanitary bathrooms, rodent control problems, lack of toilet paper, electrical problems); Deposition of Larry Williams at 77–99, 183–88 (same); Declaration of Joe Lee Malima (bathroom inoperable; absence of toilet paper).[7]

The housing involved in this case can be assessed according to very specific criteria contained in both the federal and state regulations. *See, e.g.,* 29 C.F.R. § 1910.142 *et seq.* These criteria will not vary in any significant manner with the camps. Furthermore, since a substantial number of farmworkers lived in each of the Barnes' camps for the entire period in question, a small number of individuals will likely be able to provide testimony on the conditions in a particular camp throughout the relevant period in 1983.

Accordingly, the court finds common factual and legal issues predominate the plaintiffs' housing claims.

### (ii) *Required Posting of Notices*

29 U.S.C. § 1821(c) requires employers to post notices in migrant housing about the terms and conditions of the occupancy of the housing. Information such as the charges to be levied for housing, meals and utilities must be provided. 29 C.F.R. § 500.75(f). Whether the required notices were posted during the relevant period of time is a fairly simple question of fact easily susceptible to proof through demonstration of the systematic nature of the practice. Extensive evidence is already before the court as to allegedly illegal and undocumented sales of food, cigarettes and alcoholic beverages to a vast majority of the named plaintiffs and putative class members. *E.g.,* Depositions of farm labor contractors and supervisors Dorothy Williams at 102–106; Morrell Williams at 61; Juanita Williams at 80–81; Inez Gordon at 68; Ethel Beaver at 105; Lionel Beaver at

---

**7.** *See also* Declaration of Joseph T. Hughes, Jr., who has a masters degree in Public Health from the University of North Carolina and extensive expertise in the field of farmworker health issues, when he states, "In the course of my examination and inspection of [the Barnes labor camps], I observed numerous substantive violations at each of these camps of the federal health and safety laws and regulations applicable to the operation and maintenance of such housing."

96–100; John Edmond at 93, 120 and 143. *See also* Declarations of plaintiffs Willie Haywood; Nallie Hairston, Jr., Elbert Grays; Marshall Miller; Joe Lee Malima; and Freddie Lovett. Again, the court finds predominate common legal and factual issues.

(iii) *Providing Itemized Pay Statements*

■ 29 U.S.C. § 1821(d)(2) requires the provision of itemized pay statements, detailing the sums withheld and the purpose of the withholding, plus information as to the number of hours worked by each farmworker. Plaintiffs allege that they were systematically charged for a variety of items without the required statement being provided. The magistrate has more than adequately addressed this point in his M & R and any further discussion would be redundant. It suffices to say that substantial evidence in the record exists to support the conclusion that plaintiffs were uniformly required to endorse a check payable to them, drawn on the account of Barnes Farming Corporation, to their crew leaders who, without itemization, deducted cash amounts for a veritable host of items ranging from meals to rent to transportation. Based on the present record, it seems extraordinarily unlikely that any worker would have escaped for long this pattern of deductions. The fact that the potential amount of damages might vary individually with the number of violations does not preclude class certification where common questions of law and fact as to liability clearly predominate. This argument has been rejected time and again by the courts in a multitude of factual settings. *E.g., De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d at 233; *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir.1970); *In re Asbestos School Litigation*, 104 F.R.D. at 431; *Aguirre v. Bustos*, 89 F.R.D. at 649; *Shelter Realty Corp. v. Allied Maintenance Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y.1977), *appeal dismissed*, 574 F.2d 656 (2d Cir.1978); Wright and Miller,

*Federal Practice and Procedure:* Civil § 1784 (1972).

(iv) *Maintenance of Records by Defendants*

29 U.S.C. § 1821(d)(1) requires defendants to maintain records of pay deductions. As with the alleged itemized pay statement violations, substantial evidence is presently before the court tending to prove a systematic failure to keep the required records. *See e.g.*, Depositions of farm labor contractors and supervisors Juanita Williams at 36–37; Dorothy Williams at 17–18; 123–25; Walter Claboine at 56–57, 65–67; Ethel Beaver at 139, 173–74; Lionel Beaver at 74, 68–76.

■ Accordingly, although there may be some differences in the treatment of individual class members, common questions of law and fact predominate. Plaintiffs allege widespread and consistent violations of the AWPA. There may be variations in proof, but the court finds these can be measured against a common factual and legal background.

(b) *"Fluid-Recovery" Concept*

■ Defendants argue that what plaintiffs essentially seek is an across-the-board award of damages to the class as a whole without proof of individual damages, i.e., a "fluid recovery." *See Windham v. American Brands, Inc.*, 565 F.2d at 70–71. Defendants are correct in their conclusion that this circuit bars the use of a "fluid recovery" arrangement, *see id.* and *Galloway v. American Brands, Inc.*, 81 F.R.D. 580, 586 (E.D.N.C.1978); however, defendants are incorrect in their basic premise that plaintiffs' claims invoke the concept.

■ The question of statutory liquidated damages under the AWPA is *not* one which requires individual proof of actual damages to authorize any monetary recovery as contrasted with the anti-trust cases cited by defendants in support of their argument that individualized actual damages will make plaintiffs' claims unmanageable.[8]

---

**8.** 29 U.S.C. § 1854(c)(1) states:

If the court finds that the respondent has intentionally violated any provision of this

The claims for statutory damages under the AWPA are the type

> ... where the fact of injury and damage breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation. (quotation marks, citations and footnotes omitted).

*Windham v. American Brand, Inc.,* 565 F.2d at 68. *See De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d at 239–40. In this type of class action damages claim, the statutory damage provision essentially relieves the court of the obligation of determining the damages suffered by each plaintiff once an intentional violation is found. Thus, individualized claims for damages "offer no barrier to class certification." *Windham, supra* at 68. *See Rios v. Marshall,* 100 F.R.D. 409–10.

### (c) *Joint Employment*

By far, the most hotly contested issue in the class certification process has been the question of whether plaintiffs were "employees" of the Barnes so as to trigger the provisions of the AWPA on three of plaintiffs' four claims. Prior to discussing the merits of this issue, however, a subtle yet important procedural problem must be addressed—one which has quite apparently caused both the parties and the court some confusion.

As previously noted, *supra* n. 6 at 581, defendants originally contended that the disposition of this issue varied with the circumstances of each farmworker, thus, requiring a finding that individual issues predominate over common questions of law and fact. Subsequently, defendants hardened this stance to argue that defendants were not the employers of *any* farmworker

in 1983. Concomitant with this tactical charge, defendants requested the court *dispositively* decide the employment relationship issue based on the present record, justifiably arguing that a favorable determination of this issue would eliminate a significant portion of the litigation. Although it was not clearly perceived as such at the time, what defendants were indirectly and implicitly requesting was that the court grant partial summary judgment in their favor on the joint employment question. Their argument clearly boiled down to saying no genuine issue of material fact exists and the court must find the absence of any employment relationship between plaintiffs and defendants. What hid the obvious, was that the request, not labeled as such, was made in the context of defendants' objections to the magistrate's ruling on plaintiffs' motion for class certification.

Plaintiffs' initial reaction to defendants' extended argument on the joint employment issue was that a dispositive decision was not required prior to class certification and that the magistrate's finding that "this determination can likely be made [at trial] on a classwide basis" was sufficient and supported by the record. Subsequently, plaintiffs argued, (again, apparently without recognizing the procedural significance of defendants' implicit request for partial summary judgment), that on the merits, any ultimate finding must result in a determination that the defendants were the sole or joint employers of the plaintiffs. It was in this posture that briefs were filed on the joint employment issue, both sides effectively arguing not just for a limited class certification finding such as the magistrate made; rather both sides now arguing for partial summary judgment.[9]

---

Act or any regulation under this Act, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff violation, or other equitable relief, except that (A) multiple infractions of a single provision of this Act or of regulations under the Act shall constitute only one violation for purposes of determining the amount of statutory damages due a plaintiff; and (B) if such complaint is certified as a class action, the

court *shall* award no more than the lesser of up to *$500 per plaintiff per violation* or up to $500,000 or other equitable relief. (emphasis added).

**9.** The current record is, and has been for some time, much more extensive than that which existed at the time Magistrate Leonard issued his M & R. Depositions from nearly all the named plaintiffs, defendants and farm labor contrac-

Approximately six months ago, plaintiffs obviously now aware of the status of the arguments between the parties, finally moved for partial summary judgment on the employment relationship question. Defendants, just as obviously unaware of what their original request for a dispositive decision had meant, objected claiming further discovery was necessary to decide the issue and the motion, therefore, was premature. This court, not fully cognizant of the procedural posture of the issue either, reluctantly allowed defendants' motion for an extension of time to respond to plaintiffs' motion and granted limited further discovery, even though it found "the information regarding the joint employment issue is almost exclusively within plaintiffs' possession and that extensive materials on the issue have already been filed." Order of July 17, 1985 at 1.

Here the matter presently lies and the question is whether the court should decide the issue at bar, confining itself to the limited 23(b)(3) scope which the magistrate used [10] or whether partial summary judgment, if appropriate for either party, should be granted at this stage of the proceedings. Although the court was originally reluctant to make a binding decision at the class certification stage, it now appears that the record on the issue is so exhaustive that a dispositive answer to the question can be rendered without substantial difficulty. Both sides have had numerous opportunities to supplement the record at will and have done so. The court seriously doubts any further evidence exists on the topic which would be material and noncumulative.[11]

Accordingly, with the record so complete and the dispositive issue so thoroughly outlined and briefed by the parties, the court will accede to defendants' implicit request and plaintiffs' now explicit motion and will,

if possible, dispositively decide the joint employment issue which is a matter of law anyway on the present record. The order of July 17, 1985 is hereby VACATED.

■ Turning to the merits of the substantive issue, a close examination of the relationship between the plaintiffs, defendants and the farm labor contractors is required. If the farm labor contractors, who recruited plaintiffs for their work on the Barnes' farms in 1983, were themselves employees of the defendants, then defendants were plaintiffs' *sole employer*. However, even in the event the farm labor contractors were independent contractors, this court could still conclude defendants were *joint employers* of the plaintiffs. *Castillo v. Givens*, 704 F.2d 181, 188 (5th Cir.1983), *cert. denied*, 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1984). "There may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees," *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947), but independent contractor status does not necessarily imply the contractor is solely responsible for his employees under the AWPA. *See Hodgsen v. Griffin and Brand of McAllen, Inc.*, 471 F.2d 235, 237 (5th Cir.1973), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). Another employer may be jointly responsible for the independent contractor's employees. *Id.; Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748, 756 (9th Cir.1979).

Defendants contend that: (1) the farm labor contractors or "crew leaders" were independent contractors and (2) the crew leaders were plaintiffs' sole employers. In broad terms, defendants argue that the evidence does not sustain a finding that they were plaintiffs' employers, joint or

---

tors have been filed as will as numerous affidavits, declarations and exhibits from the same.

**10.** If the court had decided to so limit its review of the magistrate's recommendation, the substantive discussion which follows would have been minimal since the recommendation was without any doubt correct—"common issues

predominate on the 'joint employer' question." M & R at 9–10.

**11.** If such turns out not to be the case, the court will obviously entertain a motion to reconsider any summary judgment ruling.

individually, because they did not exercise control or any degree of regular supervision over the farmworkers.

Upon an exhaustive review of the depositions, exhibits, affidavits, declarations and briefs filed, the court is persuaded otherwise. Since the court finds that the defendants were, at least the *joint employers* of the farmworkers, it need and does not reach the closer question of whether the crew leaders were independent contractors. *Id.; Hodgson v. Okada,* 472 F.2d 965 (10th Cir.1983). *Cf. Castillo v. Givens, supra* at 188 (concluding the crew leader was an employee of the defendants, thus, vitiating the necessity for the joint employer inquiry).[12]

Pursuant to regulations promulgated by the United States Department of Labor under the AWPA, the definition of the term "employ" includes the "joint employment" principles applicable under the Fair Labor Standards Act (FLSA). 29 C.F.R. § 500.20(h)(4) (" 'Joint employment' under the [FLSA] is joint employment under the [AWPA]").

The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer relation to an employee." 29 U.S.C. § 203(d). The term "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). And, the statute defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g).

 Courts have adopted an expansive interpretation of the above definitions under the FLSA, in order to effectuate the broad remedial purposes of the Act. *See, e.g., Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 144 (6th Cir.1977); *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1311, n. 6 (5th Cir.1976), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976). In fact, "[a] broader or more comprehensive coverage of employees ... would be diffi-

cult to frame." *United States v. Rosenwasser,* 323 U.S. 360, 362–63, 65 S.Ct. 295, 296, 89 L.Ed. 801 (1945). *See also Wirtz v. Silbertson,* 217 F.Supp. 148, 151 (E.D.Pa. 1963). The common law concepts of "employee" and "independent contractor" are not conclusive determinants of the FLSA's coverage. *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d at 754; *Mednick v. Albert Enterprises,* 508 F.2d 297, 299 (5th Cir.1975). Rather,

> in the application of social legislation employees are those who *as a matter of economic reality* are dependent upon the business to which they render service.

*Real v. Driscoll, supra* at 754 *quoting Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 1550, 91 L.Ed. 1947 (1947). *See also Goldberg v. Whitaker House Cooperative,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961).

 Thus, it is well-established that the issue of whether an employer/employee relationship exists under the FLSA, and hence the AWPA, must be judged by the "economic realities" of each individual case. *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 470–71 (11th Cir.1982). A person is responsible as an "employer" of another where the work "follows the usual path of the employee," and where, as a matter of economic reality, the employee is dependent upon that person for their livelihood. *Id.; Rutherford Food Corp. v. McComb,* 331 U.S. at 729, 67 S.Ct. at 1476. The touchstone of economic reality in analyzing the possible employment relationship is clearly economic "dependency." *Castillo v. Givens,* 704 F.2d 139 at 188. That the defendants may not have intended to create an employment relationship is irrelevant; "it is sufficient that one person 'suffer or permit [another] to work.' " *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d at 470–71 citing *Brennan v. Partida,* 492

---

**12.** The court is cognizant of the fact that this approach reverses the normal order of inquiry, but given the parties' emphasis on the *joint employment* issue and the nature of the evidence presented, this analysis seemed the most logical and economical for this case. As the citations prior to this footnote indicate, other courts have likewise adopted this line of inquiry.

F.2d 707, 709 (5th Cir.1974).[13] This determination of whether a particular factual setting gives rise to coverage under the FLSA and AWPA is a matter of law. *Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984); *Castillo v. Givens*, 704 F.2d at 185.

■ Consistent with these principles, an employee may be employed jointly by two employers, even when one of the employers is itself under contract to perform work for the other employer. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964). *See also* 29 C.F.R. § 791.2(a) and (b). Thus, a company which engages independent farm labor contractors to supply workers to it can be considered the employer of those workers if, as a matter of economic reality, the workers are dependent on the company. *Rutherford Food Cop. v. McComb, supra.*

■ Over the years, the courts have identified a number of factors useful in considering "joint employer" determinations:

1) ownership of the property and facilities where the work occurred;[14]

2) degree of skill required to perform the job;[15]

3) investment in equipment and facilities;[16]

4) permanency and exclusivity of employment;[17]

5) the nature and degree of control of the workers;[18]

6) the degree of supervision, direct and indirect, of the work;[19]

7) the power to determine the pay rates or the methods of payment of the workers;[20]

8) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers;[21] and

9) preparation of payroll and the payment of wages.[22]

The presence or absence of any individual factor is not dispositive of whether the economic realities indicate the existence of an employee/employer relationship. Such a determination depends "upon the circumstances of the whole activity." *Id.* at 730, 67 S.Ct. at 1477. Application of these guidelines now follows.

### (i) *Ownership of the Property and Housing*

Defendants are engaged in the cultivation, harvesting, handling, packaging and marketing of fruit and vegetables in Nash and Wilson Counties, North Carolina. Defendants own and operate a substantial fruit and vegetable warehouse and packing establishment and conduct extensive farming operations.

In the spring and summer of 1983, defendants engaged in harvesting operations for sweet potatoes, pickle cucumbers, cantaloupes and broccoli. An efficient harvest requires a significant amount of manual labor, and the required labor force is drawn in large measure from migrant farmworkers. The Barnes, as do other agricultural enterprises similarly engaged, generally obtain the services of these farmworkers by dealing with certified farm labor contractors or "crew leaders." The crew lead-

**13.** In this regard, economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA and AWPA. *Rutherford Food Corp. v. McComb*, 331 U.S. at 729; 67 S.Ct. at 1476; *Donovan v. Tehco*, 642 F.2d 141, 143 (5th Cir.1981).

**14.** *Rutherford Food Corp. v. McComb*, 331 U.S. at 730, 67 S.Ct. at 1477; *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669 (5th Cir.1968).

**15.** *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d at 754–55.

**16.** *Id.*

**17.** *Hodgsen v. Griffin and Brand of McAllen, Inc.*, 471 F.2d at 237–38.

**18.** 29 C.F.R. § 500.20(h)(4)(ii)(A).

**19.** 29 C.F.R. § 500.20(h)(4)(ii)(B).

**20.** 29 C.F.R. § 500.20(h)(4)(ii)(C).

**21.** 29 C.F.R. § 500.20(h)(4)(ii)(D).

**22.** 29 C.F.R. § 500.20(h)(4)(ii)(E).

ers are aware of the various locations at which the migrant workers congregate and seek employment, and thus are able to secure them in substantial numbers on short notice. After a crew leader contacts the laborers, he then transports them to the work site.

In this case, the Barnes contacted and used approximately ten crew leaders. They were responsible for transporting the migrant workers to North Carolina in their own vehicles. These same vehicles were later used on a daily basis to transport many of the workers between the fields and the labor camp housing areas.

From the record, there is no doubt that the defendants owned or leased *all* of the land and housing where the employment of the named plaintiffs and putative class occurred in 1983. The farmworkers stayed at labor camps owned and generally maintained by the defendants, often with the cost of meals, utilities and transportation being deducted from plaintiff' paychecks. When repairs were required at the camps, and to the extent they were effected, employees of the defendants performed the maintenance work. Depositions of farm labor contractor Coletia A. Gibson at 91 and plaintiff Alonzo Howell at 106–07. Neither the migrants nor the farm labor contractors could ever become owners of the land or housing as a result of their work for defendants. Clearly, defendants' ownership was absolute and total.

### (ii) *Degree of Skill required*

Farm work performed by the migrant workers is unskilled labor. No argument to the contrary is possible. No special skill, experience or aptitude is necessary to perform the tasks of pulling vines and weeds, picking cucumbers and cantaloupes, cutting broccoli, or setting plants. To the extent any training was required, it was consistently provided by the defendants or one of their employees—not by the farm

labor contractors. Depositions of farm labor contractor John T. Edmond at 45, 49; plaintiffs Easaw Moore at 21–23, 27–28, 62–63; and Marshall Miller at 33–34.

The record unquestionably demonstrates that the tasks regularly performed by the migrant workers were routine and that they constituted an integral phase of the normal operations of defendants' business. *See Castillo v. Givens,* 704 F.2d at 191; *Donovan v. Gilmor,* 535 F.Supp. 154, 162 (N.D.Ohio 1982), *appeal dismissed,* 708 F.2d 723 (6th Cir.1982).[23]

### (iii) *Investment in Equipment and Facilities*

Defendants owned substantially all of the mechanical equipment, including tractors, trucks and transplanter machinery used to plant, cultivate and harvest the crops. *E.g.,* Depositions of defendant Carson Barnes at 105–06; and farm labor contractors John T. Edmond at 35–36; Juanita Williams at 28; and Coletia A. Gibson at 11. Defendants also provided much of the light equipment and tools needed for the field workers' tasks, including the knives for cutting broccoli, buckets for harvesting crops, boxes for packing sweet potatoes, and measuring devices for cucumbers and sweet potatoes. *E.g.,* Depositions of farm labor contractors Ethel Beaver at 44–45; Manford Hymes at 56–58; John T. Edmond at 49–51; Coletia A. Gibson at 31–32, 34–35; defendants Maxine Barnes at 39; and Carson Barnes at 31.

As for the farm labor contractors, their investment in some light tools and a few scattered buses and trucks was minimal in comparison with the total investment in land, housing, heavy machinery, storage facilities, equipment, tools and supplies by the defendants. *See Real v. Driscoll Strawberry Associates,* 603 F.2d at 755. And as for the migrants, they generally provided no tools at all.

---

**23.** The hand harvest field labor of the plaintiffs was only one step in the multi-step production process used by defendants to produce their crops. Plaintiffs were engaged almost exclusively in the hand harvest and weeding field operations, while defendants employed numerous other permanent employees to plant, spray, cultivate, process, pack and market their agricultural commodities.

Thus, the investment contributed by the farm labor contractors and migrant farmworkers was nearly zero. "Investment in this instance is understood to be large expenditures, such as risk capital, or capital investments, and not negligible items or labor itself." *Donovan v. Gilmor,* 535 F.Supp. at 161 *citing Wirtz v. Lone Star Steel,* 405 F.2d 668 (5th Cir.1968) and *Mednick v. Albert Enterprises, supra.* Accordingly, as with the first two factors, no genuine issue of material fact exists in evaluating this criterion, and it likewise falls in favor of the defendants' status as a joint employer of the plaintiffs.

### (iv) *Permanency and Exclusivity of Employment*

■ A vast majority of the migrants remained at defendants' farm and labor camps for as long a period as work was available to them. The fact that the plaintiffs and the farm labor contractors worked only for the Barnes on a seasonal basis does not vitiate the essential permanency of the relationship with the defendants. As Judge Carr insightfully stated in *Donovan v. Gilmor, supra:*

> Harvesting of crops is a seasonal industry, without much permanence beyond the harvesting season. However, temporary the relationship may be it is nevertheless true that the relationship is permanent to the extent that the migrants work only for defendants during the season.

535 F.Supp. at 162. *See also Castillo v. Givens,* 704 F.2d at 192.

The record in this case persuasively demonstrates that when the plaintiffs were in North Carolina as members of the crews furnished to the defendants in 1983, they were *expected* to perform and did perform agricultural labor *exclusively* for the defendants whenever the Barnes had any work that needed to be done. Transcript of Hearing, January 4, 1985, pp. 52 and 59 (Testimony of John T. Edmond and stipulation as to testimony of Lionel Beaver); Deposition of Coletia A. Gibson at 22–23 and 67.

Furthermore, when additional workers were needed in defendants' packing and grading operations, the Barnes employed as many as ten to fifteen migrant farmworkers a day to supplement their traditional labor forces in those areas. Depositions of Carson Barnes at 22–23 and Maxine Barnes at 38–39.

Accordingly, the court finds the relationship between plaintiffs and defendants possessed substantial indicia of permanency and exclusivity despite the fact that the harvesting industry is inherently seasonal.

### (v) *Nature and Degree of Control*

■ In assessing this factor, the court notes that the *right* to control, not necessarily the actual exercise of that control is important. "The absence of the need to control should not be confused with the absence of the right to control. The right to control ... requires only such supervision as the nature of the work requires." *McGuire v. United States,* 349 F.2d 644, 646 (9th Cir.1965).

That being said, it nevertheless is evident, in observing the totality of the business relationship between the defendants and the farmworkers, that the Barnes exercised a substantial amount of control over the work performed and working conditions of the plaintiffs. Defendants made all the decisions and were fully responsible for the cultivation, fertilization and harvesting of their crops. Each day, they determined in which fields the plaintiffs were to work, when they were to start, when they were to stop, when a particular field was ready for harvest, the quantity to be harvested and generally the manner in which the particular task was to be accomplished. *E.g.,* Depositions of Maxine Barnes at 76–78; Carson Barnes at 38–44; Laurie Chancy at 7, 9, 14–45, 59–61; and Morrell Williams at 25.

Defendants also engaged in direct control of plaintiffs through constant onsite supervision of plaintiffs' work in the fields throughout the day. *See* discussion *infra* at 44. In this regard, the defendants used a two-way radio in the fields to coordinate their use of the farmworkers. Deposition

of Carson Barnes at 44–45. In addition, as previously discussed, the farmworkers frequently performed other work for the defendants in packing and grading.

With regard to the farm labor contractors, many of them were paid at the same hourly rate as were the plaintiffs, *see* deposition of Carson Barnes at 96–99, and their deposition testimony, along with the reasonable inferences which can be derived therefrom, leaves little doubt as to who was actually in charge of the day-to-day field operations. *E.g.*, Depositions of Coletia A. Gibson at 12–15, 20–23, 27–41; Lionel Beaver at 24, 32, 38, 81; John T. Edmund at 40, 46, 49, 59–61, 75–76; and Dorothy Williams at 68–70, 98–100. *See also* Depositions of plaintiffs Marshall Miller at 34–36; and Easaw Moore at 20–23. It is interesting to note, and in more than just passing, that defendant Barnes Farming Corporation "assisted" the farm labor contractors it used in 1983 in paying fines assessed against them by the United States Department of Labor. Deposition of Carson Barnes at 227–228.

Finally, as analysis of the remaining factors will establish, neither the migrant workers nor the farm labor contractors had any control over the price paid for the crops nor the payment of wages. Together, these facts demonstrate the overwhelming right to control and, indeed, the significant actual control assumed by defendants in their agricultural operations. The farmworkers controlled very few aspects, if any, of their employment independent of defendants. The farm labor contractors, in actuality, fared little better. Most decisions involving judgment, initiative, or basic control were made by the defendants. All meaningful aspects of the business relationship were dominated by defendants: price, crop cultivation, fertilization and harvesting, method and amount of payment, and work assignments.

Accordingly, this factor likewise falls in favor of the plaintiffs. *See Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir.1983); *Castillo v. Givens*, 704 F.2d at 192; *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d at 755; *Donovan v. Gilmor*, 535 F.Supp. at 161.

### (vi) *Degree of Supervision*

The record in this case establishes beyond peradventure that defendants directly supervised plaintiffs' work through on-site instructions, commands and directions in the fields in which plaintiffs worked. Testimony in this regard is simply too numerous to even summarize, but for examples, *see*, Depositions of Maxine Barnes at 35–40; Lionel Beaver at 24–32; Ethel Beaver at 51–54; John T. Edmond at 43–46, 49–52, 59–61, 80–82; Manford Hymes at 38–47; Coletia A. Gibson at 27–42; Diane Sanders at 13–16, 39–41; Marshall Miller at 18, 33–34; Elbert Grays at 26–27, 40, 45–46; Willie Haywood at 23–24, 82–84, 99–104; and Mayvell Ransom at 60–65, 108–114. Defendants Laurie Chancy and Maxine Barnes as well as Carson Barnes' son, Johnny, exercised frequent and significant involvement in the day-to-day field supervision, with these three and other agents of the defendants dividing up the fields daily according to various lines of responsibility. The fact that defendants often effected this supervision by speaking to the crew leaders, who in turn spoke to the farmworkers, rather than speaking directly to the plaintiffs, does not negate the obviously extensive degree of on-the-job supervision that existed. *Hodgson v. Griffin and Brand of McAllen, Inc.*, 471 F.2d at 238. Reality can not be so easily masked by transparent attempts to cover over the truth with a deceptive label.

### (vii) *Pay Rates and Methods of Payment*

Defendants had the power to determine and, in fact, did determine the method of payment to the plaintiffs, with Barnes Farming Corporation preparing and issuing payroll checks for every migrant worker. Depositions of Carson Barnes at 46–54; Laurie Chancy at 55–56; Dorothy Williams at 48–49; John T. Edmond at 88–89; and Walter Lee Claboine at 18. The decision to institute this method of payment was made

solely by Carson Barnes. *E.g.*, Depositions of Carson Barnes at 53 and Dorothy Williams at 100.

The record also establishes that the defendants determined the rate of pay to be paid the plaintiffs for each of the particular crops harvested in 1983. Hourly rates were generally used for cantaloupes and broccoli. *E.g.*, Depositions of Lionel Beaver at 40–41; John T. Edmond at 57A–58, 74; and Dorothy Williams at 39. Piece rates were established for harvesting the cucumbers and sweet potatoes. This means plaintiffs were paid according to actual amount of the crop picked. *E.g.*, Depositions of Lionel Beaver at 42–43, 82; Juanita Williams at 42–44; and Coletia A. Gibson at 51–53; A number of the farm labor contractors were paid the same rates, particularly the hourly rates, as were the members of their crew. *E.g.*, Depositions of Barnes Farming Corporation by Catherine Williams at 26–30; and Lionel Beaver at 83–84.

Based on the aforesaid, the court finds defendants maintained and exercised the power to determine the rates of pay and methods of payment of the plaintiffs.

#### (viii) *Right to Hire, Fire and Modify Employment Conditions*

Although the farm labor contractors possessed the power to hire and fire members of their respective crews, that power was exercised concurrently. Deposition testimony reveals that (1) Carson Barnes fired a farm labor contractor because the workers supplied by the contractor did not harvest cucumbers correctly, *see* Deposition of Carson Barnes at 43–44; (2) defendants and their agents, on numerous occasions, threatened to fire farmworkers in the field if they did not perform their job correctly, *see, e.g.*, Depositions of Willie Haywood at 23–34, 82–84, 99–104 and Mayvell Ransom at 60–65; and (3) the defendants exercised their right to select and reject specific workers to perform specific tasks in defendants' packing house and tractor operations. *See* Depositions of Laurie Chancy at 24–25, 29–31; plaintiffs Martha Alford at 11–14, 35–36; and James Jackson at 63–64.

As for hiring, the farm labor contractors hired only the amount of farmworkers necessary to harvest the Barnes' crops. These figures were given to the crew leaders by Carson Barnes or agents of the defendants. Deposition of Morrell Williams at 45. Regardless of whether the contractors are viewed as having had the physical power to hire and fire, defendants' power over the employment relationship by virtue of their control over the purse strings was dominate. *See Bonnette v. California Health and Welfare Agency*, 704 F.2d at 1470.

Finally, as to conditions of employment—working hours, pay rates, and housing conditions and costs, defendants clearly controlled these factors. The fact that the contractors furnished plaintiffs' meals and on occasion, their water in the fields, does not negate defendants' substantial control over the plaintiffs' conditions of employment.

#### (ix) *Preparation of Payroll and Payment of Wages*

Defendants prepared and issued plaintiffs' individual payroll checks. The checks were written by the defendants on the defendants' payroll checking account, using funds provided solely by the Barnes. These weekly checks were prepared based on daily time and work sheet forms developed and supplied by the defendants, and filled in by the farm labor contractors. From that same information, the defendants prepared computer printed payroll records for the contractors, prior to any request by the contractors and without charge. *E.g.*, Depositions of Carson Barnes at 46–54, 79–83, 88–89, 92–94; Barnes Farming Corporation by Catherine Williams at 42–44, 49; Manford Hymes at 18–24, 27–29; John T. Edmond at 88–89; and Ethel Beaver at 63–65. The evidence further reveals that in many cases the farm labor contractors could not explain, at their depositions, the figures and entries on the computer printed payroll records in their possession. *E.g.*, Deposition of Manford Hymes at 23–29; Coletia A. Gibson at 104–107; and Lionel Beaver at 109–115.

In addition, Barnes Farming Corporation made all FICA/FUTA deductions from the migrant workers and paid those taxes for the farm labor contractors, without request or charge to the contractors, as a "service" to the contractors. Depositions of Carson Barnes at 88–92 and Barnes Farming Corporation by Catherine Williams at 34–41. Most of the books and records maintained in connection with the 1983 season were kept by and continue to be in the possession of the defendants.

Therefore, the court finds overwhelming involvement by the defendants in the preparation of plaintiffs' payroll and the payment of their wages. The fact that the contractors computed certain deductions and physically handed plaintiffs their checks is irrelevant.

■ Based on these findings, the court holds that no genuine issue of material fact remains on the joint employment issue.[24] Notwithstanding the fact that a number of disputed facts exist in the record, the undisputed or uncontradicted facts relied on above, establish that defendants were the joint employers of plaintiffs as a matter of law. Every factor analyzed weighs heavily in favor of a finding of joint employment. Specific citations made to deposition testimony in the court's discussion are consistently and repeatedly confirmed by materially identical testimony of other plaintiffs, defendants or farm labor contractors. Defendants exercised significant control over the nature and structure of the employment relationship. They effected, in a practical sense, complete economic domination over the relationship.

Thus, there is no room remaining for doubt. The economic reality was that in 1983 the defendants employed the plaintiffs to perform agricultural labor for their benefit. The fact that defendants may have delegated certain minor responsibilities to the crew leaders can not alter this conclusion. Form will not be allowed to triumph over substance.

Accordingly, plaintiffs' motion for partial summary judgment is GRANTED and defendants are deemed to be the joint employers of the plaintiffs and the putative class under the AWPA.

## 2. Superiority

Finally, class certification is available under Rule 23(b)(3) only when such treatment is "superior to other available methods" for the resolution of the dispute. Rule 23(b)(3) sets forth four criteria relevant to this determination:

(A) The interests of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the difficulties likely to be encountered in the management of a class action.

No one factor is dispositive of the question. *Galloway v. American Brands, Inc.*, 81 F.R.D. at 584.

With regard to the first criteria, there is no evidence that unnamed class members in the instant case have any interest in instituting or controlling individual actions. Moreover, the extremely low income level of the members of the putative class in combination with the relatively small amount likely in any individual recovery renders certification of a plaintiff class particularly appropriate in this litigation. *See Rios v. Marshall*, 100 F.R.D. at 409; *Aguirre v. Bustos*, 89 F.R.D. at 649.

The second factor is not a concern in this litigation. Although the pendency of related actions in certain cases may indicate the existence of more appropriate vehicles than a class action for the vindication of those

---

**24.** In determining whether summary judgment should be granted, the court is guided by the principles of summary judgment expertly defined by Judge Wilkinson of the Fourth Circuit Court of Appeals in the recent case of *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364–65 (1985). Because his discussion is lengthy, it is not repeated here.

plaintiffs' rights, the court is unaware of any parallel litigation involving the same issues as those at bar.

As for the third factor, the desirability of concentrating all the litigation in this forum, the court finds that joinder of all class members in a single action would be impracticable and maintenance of separate but identical actions would be enormously wasteful. *Id.* If this case were not certified as a class action, duplication of effort would be substantial and the risk of inconsistent and unjust results high. Common issues of law and fact predominate on all issues of liability and, if liability is established, the statutory damage provision relieves the court of much of the burden of determining damages. The court will not be deluged with mini-trials on the damages issues. *See* discussion *supra* at 27–28.

Defendants contend that (1) the United States Department of Labor, in its discretion, could administratively enforce the AWPA against the defendants, thus eliminating the need for this litigation and (2) class certification might prevent settlement of the case. Neither argument has merit. Defendants preference for Department of .Labor action is simply that—a preference, which can not and does not defeat plaintiffs' explicit right to bring a private cause of action under the AWPA.

Furthermore, defendants' settlement argument falls upon deaf ears. Numerous attempts to settle this action have failed. The court postponed a decision on the motions which are the subject of this opinion for some time, awaiting fruitful negotitions. No settlement has been effected and none is seen on the horizon. Both sides claim they want to discuss settlement, and settlement based on the posture of the case remains a viable alternative, yet little apparent progress has been made on this front in some time. Perhaps this opinion will provide additional impetus for future discussions; it certainly can do no harm.

█ Finally, as to the question of manageability, there are undoubtedly administrative complications in managing a class of this sort, but as the magistrate suggested, tools exist to make the process work. Class membership can quickly be defined with issues bifurcated, if necessary, and subclasses defined. Plaintiffs have put forward the elements of an acceptable plan for giving notice to class members which can now be refined by the parties and Magistrate Leonard. If problems develop which were unanticipated, this certification is interlocutory and decertification is always permissible. In sum, the court finds that certification of a plaintiff class will provide a superior method for resolving the AWPA claims against the defendants. *See, e.g., De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d at 233; *Aguirre v. Bustos,* 89 F.R.D. at 649; *Carter v. Owatonna Canning Co., Inc.,* 90 L.C. at 49, 450.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for leave to amend their motion for class certification is GRANTED; plaintiffs' motion for partial summary judgment on the joint employment issue is GRANTED; and plaintiffs' motion for class certification is GRANTED with the following class hereby CERTIFIED pursuant to F.R.Civ.P. 23(b)(3):

> All migrant farmworkers who were used or employed by the Barnes defendants and one or more farm labor contractor(s) used by any of the Barnes defendants at any time during the period from April 12, 1983 to August 1, 1983, who were housed in migrant farmworker temporary housing located in Nash or Wilson Counties, North Carolina, which was owned by any of the Barnes defendants and controlled by one or more of the farm labor contractors used by the Barnes defendants in that time period whose rights under 29 U.S.C. §§ 1821(d)(1), 1821(d)(2), 1821(c) and 1823 were violated by any of the defendants.

Counsel are directed to confer with Magistrate Leonard concerning the contents and procedure for service of the Rule 23(c)(2) notice within twenty days of the date of

this order. Magistrate Leonard is authorized to actively supervise an expedited post-certification notice, discovery and pre-trial period. The magistrate is further empowered to engage in any settlement conference the parties wish to hold before or with the court and to actively encourage such discussions.

SO ORDERED.